Ulysses S. Gandy appeals from his second conviction of manslaughter. In Gandy v. State, 355 So.2d 1096 (Miss. 1978), we reversed Gandy's conviction and remanded the case to the Circuit Court of Oktibbeha County for a new trial. This trial again culminated in a verdict of guilty and a sentence of ten years in the state penitentiary.
Gandy assigns as error:
 1. The court committed reversible error in overruling appellant's request for peremptory instruction and motion for new trial on the ground that the verdict of the jury was contrary to the overwhelming weight of the evidence.
 2. The court committed reversible error in refusing Instruction D-13.
 3. The court committed reversible error in admitting into evidence State's Exhibits 1, 5 and 7. *Page 1044 
 4. The court committed error by not giving the jury a recess for food or refreshments during its deliberations.
At approximately 10:30 on the evening of June 26, 1976, the appellant was involved in a two-car collision on Mississippi State Highway 25 about four miles south of Starkville. The highway runs generally in a north-south direction, with an unobstructed view in both directions on a straight stretch of road at the scene of the accident.
The appellant was driving a Pontiac automobile in a southerly direction and Daniel Palmer was driving a Toyota automobile in a northerly direction when the collision occurred. Although the appellant was not seriously injured, Daniel Palmer and the two passengers in his automobile were killed. No person now living witnessed the collision except Gandy though a number of persons arrived at the scene shortly after the two automobiles had come to rest following impact.
The testimony concerning the positions of the automobiles after impact conflicted. Jerry Devine, an acquaintance of Gandy, testified that he was the second to arrive at the scene. He found the Toyota in the northbound lane of the highway headed north and the Pontiac in the southbound lane headed south with its left front wheel on the center line of the highway. Several other witnesses who arrived at the scene shortly after the collision testified they observed both vehicles several feet apart in the northbound lane of the highway, the Pontiac headed south and the Toyota headed north with debris from the collision concentrated in the northbound lane between the two.
Testimony concerning Gandy's intoxication at the time also conflicted. Jerry Devine testified that although he did not converse with Gandy he did stick his head inside Gandy's automobile shortly after the accident while he helped an officer remove Gandy's wallet. Devine stated that although he did not himself drink, he knew the smell of alcohol and smelled none in Gandy's car. Dr. Conner, a longtime physician of appellant and his family, treated Gandy beginning at about 11:30 p.m. following the accident. Based upon his contact with Gandy at the time of treatment, he was of the opinion that Gandy had not been drinking. He noted that Gandy cooperated in the emergency room and suggested that natural deficiencies in his speech which were known to him might have made Gandy appear less lucid to others.
Bobby Poe, another acquaintance of Gandy, spent about fifteen minutes with Gandy at the hospital X-ray room late on the night of the accident. Poe had difficulty remembering who assisted him in the X-ray room that night but said he did remember that he smelled no alcohol about Gandy's person. Also, at about 1:30 a.m., some three hours after the accident, a nurse noted on a medical report that Gandy appeared "alert and oriented."
On the other hand, nine witnesses testified to various circumstances which suggested that Gandy was extremely intoxicated at the time of the collision. Witness Benny Rogers testified that at the scene of the collision he placed his head in the open window of Gandy's car and detected a "strong" odor of alcohol. Highway Patrolman R.N. Pearson stated that the smell of alcohol was "very evident inside the car and around . . . Mr. Gandy." Constable Robert Howell detected "odors of beer" in Gandy's car and stated that Gandy "was drunk" when he spoke with him at the scene. Chief Deputy Sheriff Dell Wilson also talked with Gandy at the scene; before Gandy was moved from his car, Wilson detected "a very strong odor of liquor and beer" about Gandy's person. He further testified that Gandy at that time did not appear to be "in control of his faculties," concluding that Gandy "was intoxicated." Highway Patrolman Lynn Christopher "could . . . smell liquor" in Gandy's car and noticed "a beer can and an empty whiskey bottle on the floorboard." Also, when he saw Gandy once more, about an hour later in the hospital, he "could smell liquor" on Gandy's breath. Christopher testified that Gandy was "very intoxicated" on the night of the accident. *Page 1045 
Medical technician Rick Hailey stuck his head in Gandy's car before Gandy was removed from it and detected a "very strong" odor of alcohol on Gandy's breath. Another medical technician, Dan Seale, helped remove Gandy from his car. At that time, he noticed that Gandy "smelled like alcohol" and concluded that Gandy was "drunk." In describing the strength of the odor, Seale stated, "on a scale of one to ten I'd say ten." In the hospital that night, X-ray technologist Rebecca Walker "came as close as a foot away from [Gandy]," smelled the odor of alcohol, and concluded that Gandy had been "drinking."
Finally, Melinda Richardson, a registered nurse who adjusted a cervical collar on Gandy at the collision scene, accompanied him to the hospital, and helped suture his facial cuts, "smelled a very strong odor of alcohol on his breath." Several of these witnesses testified that on the night of the accident Gandy spoke in a slurred, incoherent fashion. One of the officers testified that at the hospital on the night of the accident Gandy stated, "[m]e and some dudes drank some whiskey and I drank three or four cans of beer."
Leroy Tate testified that about 2:00 p.m. on the eventful day he, Gandy, and Gandy's brother purchased a case of 16-ounce cans of beer which they divided among themselves between two and three o'clock that afternoon. Tate stated that he observed Gandy drink two cans of beer and did not believe him to have been intoxicated when he last saw him at about five o'clock. Two witnesses conceded on cross-examination that Gandy's peculiar speech may have been the result of trauma from the collision rather than from drinking. There was testimony of one or more witnesses that Gandy stated, shortly after the collision, he was in his proper lane of traffic and that the Toyota crossed into it.
 I.
The standard of proof against which we test the first assignment of error is that employed in all criminal prosecutions — beyond any reasonable doubt. The jurors obviously believed the testimony of the state's witnesses concerning the position of the cars immediately following the accident and Gandy's intoxication. As is usual in jury cases, the evidence conflicted, but the conflict does not necessarily create a "reasonable doubt" of appellant's guilt. Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution. Shannon v. State, 321 So.2d 1 (Miss. 1975).
On review, if there is competent evidence to support the verdict, it will be upheld. Cobb v. State, 235 Miss. 57,108 So.2d 719 (1959); Rogers v. State, 219 Miss. 231, 68 So.2d 105
(1953); Byrd v. State, 154 Miss. 742, 123 So. 867 (1929);Ransom v. State, 149 Miss. 262, 115 So. 208 (1928). Presently there was sufficient evidence, in our opinion, for the jury to determine that Gandy was intoxicated and in the wrong lane of traffic at the time of the collision.
We are impelled to this conclusion, because the evidence shows there were two damaged automobiles, their bumpers aligned face to face in a single lane of traffic, leaving the jury free to infer without reasonable doubt, in the absence of contrary evidence, (1) that a crash occurred shortly before, (2) that the cars had not been moved from their immediate post-collision resting places, and (3) that the crash occurred in the lane of traffic where the cars and most of the debris appeared. The jury settled upon the reasonable explanation that the intoxicated appellant drove *Page 1046 
completely into the wrong lane of traffic. It resolved the conflicting evidence adversely to the appellant to the exclusion of potential theories unattractive to common sense. CompareVoyles v. State, 362 So.2d 1236, 1243 (Miss. 1978).
Mississippi Code Annotated section 97-3-47 (1972) reads as follows:
 Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter.
The appellant correctly observed that "culpable negligence" here connotes a quality of recklessness distinct from gross negligence in civil cases, and that driving while intoxicated is not per se culpable negligence but bears upon guilt only if shown to have been causally connected with the killing. Cutshall v.State, 191 Miss. 764, 4 So.2d 289 (1941). This record supports a jury verdict of culpable negligence; namely, Gandy drove into the wrong lane of traffic on a straight stretch of road with an unobstructed view. The abundant evidence of his intoxication obviously led the jury reasonably to believe, as we think it did believe, there existed a causal connection between his intoxication and his automobile being in the wrong lane of traffic. Frazier v. State, 289 So.2d 690 (Miss. 1973), is distinguishable from the facts of this case. There, someone other than the driver grasped the steering wheel of the car which caused the accident. Here, Gandy was unaccompanied in his car, thereby presenting factual circumstances entirely different fromFrazier, supra.
The conduct held not to constitute culpable negligence in Gantv. State, 244 So.2d 18 (Miss. 1971), also differed from that presently before us. In Gant, the accident occurred when the accused swerved into the decedent's lane of travel while rounding a curve, and scant evidence suggested intoxication. In contrast, the present facts show that the appellant was on the wrong side of a straight stretch of road, and there is no indication of loss of control of the automobile caused by a curvature in the road.
Because negligence is not so much a state of mind as is the absence of it, we have construed the words "culpable negligence" as used in Section 97-3-47 to mean negligence evincing a reckless disregard for the value of human life. See Lester v. State,209 Miss. 171, 46 So.2d 109 (1950); Cutshall v. State, supra;Williams v. State, 161 Miss. 406, 137 So. 106 (1931). While we reaffirm this construction, we emphasize that "culpable negligence" carries the same legal meaning whether the instrument causing the death is an automobile or something less commonplace. Unlike Maryland, and several other states, our legislature has not drawn separate manslaughter statutes, one applicable to reckless vehicular homicide, and another applicable to other forms of involuntary manslaughter. See State v. Gibson,4 Md. App. 236, 242 A.2d 555, affirmed, 254 Md. 399, 254 A.2d 691
(Ct.Sp. App. 1968); Comment, The Fallacy and Fortuity of Motor Vehicle Homicide, 41 Nev.L. Rev. 793 (1962). In sum, we conclude the present record contains sufficient evidence of negligence great enough to support the jury's finding of culpability under our general manslaughter statute.
 II.
This assignment concerns the refusal of the trial court to instruct the jury as follows:
 The court instructs the jury that in determining whether or not Ulysses Gandy was intoxicated at the time of the accident, you may also consider the following factors, in addition to the opinion testimony of his intoxication, by the witnesses that personally observed him, along with all other relevant evidence on the issue: (1) whether the defendant was reasonably alert and oriented; (2) whether the defendant possessed a clearness of intellect and was capable of effective communication; and (3) whether defendant was in physical control of himself.
This instruction attempted to cure a defect in Instruction D-18 that had been proffered by the appellant in his first trial. We there held the trial court properly refused *Page 1047 
Instruction D-18, because it restricted the facts which the jury could consider in determining whether appellant was intoxicated.Gandy v. State, supra, at 1099-1100. While Instruction D-13, now before us, more fully enumerates the relevant factors, it offers no guidance that cannot be supplied through common judgment derived from ordinary experience. We conclude the trial court did not commit reversible error in refusing this instruction, because other instructions were given which we believe properly presented the issue of intoxication to the jury.
 III.
In appellant's first trial, the court admitted a sketch which purportedly reconstructed the positions of the cars at the time of the accident. We held this to be error, because it is within the province of the jury to determine from the physical facts the point of impact and how the collision occurred. The witnesses may not testify to the point of impact of the two vehicles, nor may they give their opinion as to the positions of the vehicles at the time of the collision, because it is speculative. 355 So.2d at 1100. Carruth v. Griffis, 220 Miss. 541, 71 So.2d 478
(1954).
In the appellant's second trial, the court again admitted the sketches, but this time the testimonial sponsors purported to use them only to illustrate the scene as personally observed by themshortly after the accident. The state contends that demonstrative evidence such as this adds clarity and interest to testimony and makes more understandable the facts to which the witness testifies. If "reasonably necessary and material," it may generally be admitted in the sound discretion of the trial court.Baggett v. State, 219 Miss. 583, 69 So.2d 389 (1954).
"Necessary and material" as used in the Baggett case means appropriate and relevant. Perusal of this record indicates that the sketches were both appropriate and relevant to illustrate the testimonies of three post-occurrence witnesses. State Exhibit 1 was admitted into evidence during the direct examination of Bennie Rogers, a passing motorist who arrived at the scene shortly after the accident. Rogers used a red pen to sketch in the position of the appellant's automobile, a blue pen to sketch in the position of the Toyota automobile, and a black pen to indicate the debris between the two vehicles. State Exhibit 5 was introduced during the direct examination of Highway Patrolman R.N. Pearson. Pearson also used different colored pens to sketch in the positions of the automobiles and debris as observed by him upon his arrival at the scene. State Exhibit 7 was introduced during the direct examination of Oktibbeha County Hospital emergency room technician Dan Seale. Substantially identical to Exhibits 1 and 5, Exhibit 7 depicted the positions of the automobiles and the debris upon Seale's arrival at the scene of the accident. A proper foundation, we think, was laid for the introduction of these exhibits, because each witness was asked whether the sketch fairly and accurately represented the scene as personally observed by him.
Unlike in the appellant's first trial, no attempt was made here to reconstruct the positions of the cars at the time of the accident. Witnesses illustrated the physical facts personally observed by them, leaving any inferences which might be drawn wholly for the jury. Under these circumstances, we are of the opinion that the trial court did not abuse its discretion in admitting State Exhibits 1, 5, and 7.
 IV.
Lastly, the appellant contends the court erred by not granting the jury a recess for food or refreshments during its deliberations. The deliberations began at about 3:30 p.m. and lasted approximately two hours and fifty minutes, during which time the jurors received no food or refreshments. This assignment of error can only be considered to be without merit. Nothing prevented the jurors from requesting a recess had they desired one, and the appellant cites no authority in support of this assignment. In the absence of such citation, we *Page 1048 
are under no obligation to consider it. Ramseur v. State,368 So.2d 842 (Miss. 1979).
The judgment of the trial court is affirmed.
AFFIRMED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.