440 So.2d 297 (1983)
Robert GROSECLOSE
v.
STATE of Mississippi.
No. 53894.
Supreme Court of Mississippi.
October 12, 1983.
Rehearing Denied November 23, 1983.
*298 Ross R. Barnett, Sr., Barnett, Montgomery, McClintock & Cunningham, E. Hugh Cunningham, Jr., Jackson, for appellant.
Bill Allain, Atty. Gen. by Bill Patterson, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before WALKER, DAN M. LEE and ROBERTSON, JJ.
DAN M. LEE, Justice, for the Court:

I.
On April 4, 1981, Robert Groseclose shot and killed his ex-father-in-law, John Mulhearn, Sr. He was convicted of murder in the Circuit Court of Jefferson County and sentenced to life imprisonment.
The issue of Groseclose's sanity on April 4, 1981, predominated at trial. In spite of impressive expert testimony that Groseclose was insane, the jury convicted. Under our familiar and normally laudable rules limiting our power to review jury verdicts in criminal cases, we must affirm.

II.

A.
The facts of this tragic killing of an innocent citizen are not disputed.
By way of background, Robert Groseclose and Ruth Mulhearn were married in 1966. Three children were born of their union. The family lived in Texas. By 1976 it had become evident that Groseclose was seriously mentally ill. Various attempts at treatment, including three hospitalizations, accomplished little  in substantial part because Groseclose refused to cooperate.
All of this led to the divorce of Ruth and Robert Groseclose in November of 1980. Ruth resumed her maiden name, Mulhearn, obtained custody of the three children, and moved to her father's home outside of Natchez, Mississippi.
Some six months later, on April 4, 1981, Groseclose came to visit. Ruth, her father, John Mulhearn, Sr., and two of the children were at home. Ruth and Robert met outside. After several moments of seemingly normal conversation, Ruth noticed Robert walking toward her pointing a gun directly at her.
Groseclose said, "You're not going to poison my children's minds any more. I'm going to blow your head off." Ruth began pleading for her life and screamed for help. She dropped to the ground as Groseclose began firing. She crawled around the car. *299 Groseclose pursued. When directly in front of the car, he held the gun on the hood and pointed it directly at Ruth's head saying, "I'm going to kill you. I'm going to blow your head off." Ruth kept ducking and crawling around the car until she bumped into something, looked down, and saw her father lying there on the ground, his hand nearly blown off and blood everywhere. "Bob, you shot daddy!" she screamed.
Law enforcement authorities were ultimately summoned to the Mulhearn residence. When they arrived, they found Groseclose standing in the driveway holding a gun. He pointed out John Mulhearn, Sr. who was lying on the ground, dead.
A deputy sheriff placed Groseclose under arrest, read him his rights, and searched him, finding a knife in the back of his belt. Asked why he had the knife, Groseclose replied, "Sometimes a gun won't shoot." Groseclose added, "I've done what I come to do."

B.
The bulk of the trial concerned Groseclose's mental illness. Ms. Mulhearn described her ex-husband as "a mean man". She stated that three or four years earlier he had been diagnosed as having a chemical imbalance. He had a serious drinking problem, which, in turn, was compounded by drug use. Groseclose was admitted to hospitals for mental treatment in Abilene, Texas, Chicago, Illinois, and Kerrville, Texas. He was prescribed medication but often refused to take it.
The defense offered three expert witnesses, Dr. Donald C. Guild and Dr. Robert L. McKinley, Jr., both psychiatrists, and Dr. Charleton S. Stanley, a psychologist. Each had examined and treated Groseclose extensively at the Mississippi State Hospital at Whitfield following his arrest but prior to trial.
The psychiatric and psychological history fills hundreds of pages in the record. No useful purpose would be served in reciting it here. Suffice it to say that Drs. Guild, McKinley and Stanley were unanimous in their opinion that Groseclose was severely mentally ill. The diagnosis assigned was schizophrenia, paranoid type, chronic, severe. Each testified at trial, relying upon a substantial foundation in the record, that at the time of the shooting Groseclose did not know the difference between right and wrong and that he lacked substantial capacity to appreciate the nature and quality of his actions.
Summarizing the cross-examination, the State concentrated on the seemingly normal things that Groseclose did on April 4, 1981. At various times one or more of the experts conceded that Groseclose's actions on that day could indicate that he knew the nature and quality of his actions.
In rebuttal, the State called eight lay witnesses, each of whom had observed Groseclose at various times just prior to or just subsequent to the shooting. Mrs. Frank Walden testified she picked Groseclose up hitchhiking. She said there was nothing unusual about him. Justice Court Judge John Bailey had observed Groseclose for some 30 to 45 minutes on the morning in question and in his opinion Groseclose knew right from wrong. Deputy Sheriff Don Ward was the first law enforcement officer to arrive on the scene. He remained for approximately one hour. He testified that in his opinion Groseclose knew right from wrong and could appreciate the quality of his actions.
Sharon Powell, who lived some 35 miles from Natchez, was called as a witness by the State. She testified that on April 4, 1981, Groseclose came to her door and asked if she would buy his shotgun. He said he needed gas but had no money. He said he was going to his ex-wife's home in Natchez. She did not buy his shotgun, but did take him to the store and help him get some gas. She testified that Groseclose appeared normal, that she was not afraid of him.
Tina Thorpe testified that Groseclose came into her store with Mrs. Powell to get gas on the day of the shooting. She said he appeared perfectly rational and normal. Tom Coleman, a highway patrolman, found Groseclose stopped on the side of the road *300 on April 4, 1981, and took him to get gas. Coleman was with Groseclose for approximately ten minutes. He said Groseclose appeared rational and normal. Coleman testified that he later responded to a call for help in transporting a murder suspect back to town. He arrived at the Mulhearn residence and saw Groseclose. Coleman said Groseclose recognized him and thanked him for the help he had given him on the highway earlier that day.
Deputy Sheriff Jimmy Wallace also saw Groseclose for approximately ten minutes on April 4, 1981. He said that Groseclose had the ability to appreciate the nature and quality of his actions.
Ruth Mulhearn and her brother, John Mulhearn, Sr., were hardly disinterested witnesses. Still each testified to having known Groseclose for approximately 15 years. Each saw him for approximately 30 minutes on April 4, 1981. Each offered an opinion that Groseclose was sane at the time of the killing.

C.
At the conclusion of all of the evidence, the jury was fully and adequately instructed regarding the principal issue in the case, that of the Defendant Groseclose's sanity at the time of the killing. In due course the jury returned a verdict of guilty of the crime of murder. On October 28, 1981, Groseclose filed a motion for judgment of acquittal notwithstanding the verdict of the jury or, in the alternative, for a new trial. That motion was amended on November 3, 1981, and was in due course overruled. This appeal has followed.

III.
By far the most serious error assigned is that the jury's verdict is against the overwhelming weight of the evidence and that, accordingly, a new trial should be ordered. We have literally hundreds of decisions considering the circumstances under which we will vacate a jury's verdict in a criminal case and remand for a new trial. We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983). Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system.
In criminal cases generally, we have repeatedly stated our view of the role and function of the jury. For example, in Gandy v. State, 373 So.2d 1042 (Miss. 1979), we wrote:
Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augumented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution. Shannon v. State, 321 So.2d 1 (Miss. 1975) 373 So.2d at 1045.
In Bond v. State, 249 Miss. 352, 162 So.2d 510 (1964), this Court stated:
It is the function of the jury to pass upon the credibility of the evidence. Scott v. State, 185 Miss. 454, 188 So. 546. Only two witnesses testified for the state as to what happened at the scene of the homicide, while many more testified for the defense. However, the strength or weakness of testimony is not measured by the number of witnesses. Spiers v. State, 231 Miss. 307, 94 So.2d 803. In a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witnesses, or may believe part of the evidence on behalf of the state and part *301 of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury. Ivey v. State, 206 Miss. 734, 40 So.2d 609; Cobb v. State, 235 Miss. 57, 108 So.2d 719; Matthews v. State, 243 Miss. 568, 139 So.2d 386, 249 Miss. at 357, 162 So.2d at 512.
We apply these well settled principles to the case at bar. In doing so, we note that this is not the first time we have confronted the sort of record we have before us  one where at trial the psychiatric testimony overwhelmingly supports the proposition that the accused was insane at the time of his criminal actions, but where lay testimony, particularly that from law enforcement officers is to the contrary. We have carefully reviewed these earlier cases, such as Gambrell v. State, 238 Miss. 892, 120 So.2d 758 (1960); and Holloway v. State, 312 So.2d 700 (Miss. 1975) and have compared and contrasted those decisions with Smith v. State, 245 So.2d 583 (Miss. 1971); and Lias v. State, 362 So.2d 198 (Miss. 1978).
In Gambrell and Holloway we held that, on the facts of those cases, guilty verdicts were against the overwhelming weight of the evidence. In Smith and Lias the facts were such that the jury verdicts were not disturbed. Thoughtful and candid consideration will make clear that these decisions are not wholly consistent one with the other. We take the Lias case, however, as this Court's most recent attempt to deal with this perplexing problem, as setting forth the principles we ought follow here.
Psychiatric and psychological expert witness testimony, while admissible and indeed quite desirable, is not the last word. Lay testimony has long been recognized as being equally admissible and useful where the insanity defense is tendered. Smith v. State, supra, 245 So.2d at 585; Lias v. State, supra, 362 So.2d at 201. Expert witnesses cannot recreate what occurred in the accused's mind at the time of the criminal act, nor could they, even if they were there, look inside that mind and ascertain what was there. As in all branches of medicine, they must of necessity rely substantially on history. It is within the actual and judicial knowledge of this Court that mental health professionals routinely place great reliance upon history obtained from lay witnesses. Our law does no less when it accepts the admissibility of lay witness testimony.
Having in mind our limited scope of review, and having well in mind the testimony of the various lay witnesses recited in Section II above, there was indeed before the jury an evidentiary basis upon which a verdict of guilty could be based. Accordingly, Groseclose's motion for judgment of acquittal notwithstanding the verdict was correctly overruled.
Similarly, the substantial lay testimony in this record is sufficient to require a holding here that the verdict was not so contrary to the overwhelming weight of the evidence as to require a new trial. We say this on the authority of Lias v. State, 362 So.2d 198 (Miss. 1978) and out of our recognition that institutional and practical considerations mandate that in insanity defense cases, perhaps more than any other, a jury's verdict ought be given great respect and deference.

IV.
Groseclose assigns as error the trial judge's admission into evidence a single photograph depicting the victim's body. This photograph showed the positioning of the body at the time the law enforcement officers arrived at the scene. It is not inordinately gruesome. Its receipt into evidence was well within the trial judge's discretion. Hogan v. State, 366 So.2d 1089 (Miss. 1979). Bruce v. State, 349 So.2d 1068, 1071 (Miss. 1977); Curry v. State, 328 So.2d 328, 330 (Miss. 1976); May v. State, 199 So.2d 635, 640 (Miss. 1967). We decline to disturb the trial judge's ruling.

V.
Groseclose next complains of the trial judge's refusal to grant defendant's Instruction D-18, which reads as follows:

*302 The Court instructs the Jury that if you determine from the credible evidence in this case that the Defendant could very possibly have been, or actually was, insane at the time of the shooting on April 4, 1981, then it is your sworn duty to find the Defendant not guilty by reason on insanity.
He argues that this instruction was essential to the fair presentation of his insanity defense to the jury.
A review of the record makes it clear that the trial judge granted at the Defendant's request six instructions covering various features of the insanity defense, those being Instructions D-2, D-5, D-7, D-8, D-9 and D-12. These Instructions, coupled with State's Instructions S-1, S-2 and S-7 make it clear that the jury was more than adequately instructed on the insanity issue.
As announced by this Court many times, all instructions should be read together, and if the jury is fully and fairly instructed by other instructions, the refusal of a similar instruction is not reversible error. Barr v. State, 359 So.2d 334, 338 (Miss. 1978).
Cf. Wilson v. State, 390 So.2d 575 (Miss. 1980); Jones v. State, 381 So.2d 983, cert. den. 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (Miss. 1980). This same sentiment was expressed in McWilliams v. State, 338 So.2d 804 (Miss. 1976):
The trial court is not required to instruct the jury over and over on a principle of law, even though some variations are used in different instructions. 338 So.2d at 806.
Beyond that, the Instruction D-18 is confusing. It should not have been given as written. Smith v. State, 296 So.2d 678, 682 (Miss. 1974); Rush v. State, 278 So.2d 456, 458 (Miss. 1973).
Groseclose's assignment of error here is without merit.

VI.
We have considered the other errors assigned by Groseclose and find none well taken nor warranting discussion. We, therefore, affirm.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, HAWKINS, PRATHER and ROBERTSON, JJ., concur.
BOWLING, J., not participating.
ROBERTSON, Justice, specially concurring:

A.
Though we affirm this has been a most troublesome case. To be sure, when the heretofore existing positive rules of law stating the insanity defense, coupled with those rules regulating our scope of review, are applied here, affirmance is required, though the question is close. I write further because of the bankruptcy of the insanity defense laid bare in this case.[1]
In this state the insanity defense is judge-made. That insanity is a defense to a criminal indictment is stated in no rule of law emanating from our legislature. Similarly, the familiar (though oft criticized) M'Naghten Rule  the right and wrong test  was first announced by the English House of Lords [M'Naghten's Case, 10 Clark & F. 200, 8 Eng.Rep. 718 (1843)], and has persisted to this date as the articulate expression of the judicial branch of the sovereign.[2]
*303 All of which is to say that when and if a better way appears, it is this Court's job to modify  or abolish  the insanity defense.[3]

B.
Under our law insanity is a question of fact. Witnesses are presented pro and con. The jury is instructed, and then asked to determine whether the defendant was legally sane at the time of his actions  as though he either was or was not, there being no in-between. When we do this we proceed on a false premise. There is here nothing but an in-between. No defendant was in fact absolutely sane or absolutely insane. All were somewhere in between. We are thus dealing here with a fact issue fundamentally different from other fact issues submitted to juries.
In all other instances there is the a priori assumption that the underlying fact is an either/or proposition. Such questions generally are centered on an occurrence everyone knows either did or did not happen, a condition that either did or did not exist, no shades of gray. For example, Robert Groseclose either did or did not fire a weapon that killed John Mulhearn, Sr. Witnesses may have different memories. They may have observed the occurrence from different vantage points. Sorting out just what happened is often difficult, but no one doubts that the truth ultimately is an either/or  Groseclose did or did not shoot Mulhearn. Shades of gray exist only in the witness' testimony, not in the underlying occurrence.
Here we engage in a qualitatively different factual inquiry. In litigating the sanity of the defendant, we begin with the certain knowledge that we do not deal with an either/or. Groseclose was not either sane or insane. We know with certainty that he was somewhere in-between  with the witnesses' testimony to be weighed and evaluated to see how much light each sheds toward revealing where on the scale (which is hardly linear) Groseclose may be found.
The problem is compounded. The causal connection between Groseclose's mental state and his killing of Mr. Mulhearn is likewise not an either/or but another somewhere-in-between. Assuming it could be established that in fact Groseclose was insane at the time of his actions, determining with any precision whether and to what extent his criminal act may have been the product of his insanity is a nevertheless hopeless inquiry. In almost every case where the defendant is suffering from serious mental illness, the answer will be that his actions in part were the product of the mental illness and in part the product of other factors.
We are dealing with a state of mind, an intangible and an emphemeral one at that. The accused's state of mind is not susceptible of objective testimony. It cannot be photographed. It can be witnessed only indirectly and circumstantially and then only in imprecise and often unintelligible glimpses of symptoms.
As if the jury's job weren't tough enough, add another complexity. The illness from which Robert Groseclose suffers is particularly susceptible of misunderstanding by lay persons. Severely ill persons may appear entirely normal and rational to the unstrained observer. I have no doubt that the lay witnesses offered by the State were honest and sincere. Yet not one of them uttered a word inconsistent with Groseclose's primary diagnosis: schizophrenia, paranoid type, chronic, severe.
I say all of this before noting the most familiar problem of all  the inadequacies of the M'Naghten Rule: the right and wrong *304 test.[4] Few defend the M'Naghten Rule as stating a meaningful test for determining whether one criminally accused was or ought be held legally liable for his actions. It once seemed only a matter of time before the rule would vanish from our jurisprudence.[5] This trend away from the M'Naghten Rule has been arrested. I suggest that this is not because of any renewed confidence in the rule, rather a recognition that the proposed new cognitive and volitional tests aren't working either.
In short, the nature of the task of determining whether one is sane is such that it is beyond the ken of the most conscientious person, be he psychiatrist or juror. The rules of law we have given our jurors to work with render an impossible task a near farce. The insanity defense as it is stated in our law and administered by our juries has reached a state of bankruptcy.

C.
No help will come if all we do is treat the symptoms. Changing the test for insanity is not the answer. The problem is more fundamental. Stated another way, our patient's illness may well be terminal as well as congenital.
This case demonstrates more than anything else that law simply must remain in touch with moral beliefs prevailing in enlightened society. As is the case in so many contexts, the jury links the law to widely held societal values. See, e.g., Woodson v. North Carolina, 428 U.S. 280, 295-296, 96 S.Ct. 2978, 2986-2987, 49 L.Ed.2d 944, 955-956 (1976); Coker v. Georgia, 433 U.S. 584, 596, 97 S.Ct. 2861, 2868, 53 L.Ed.2d 982, 992 (1977). History teaches that this link is often maintained through jury nullification, a refusal to accept laws too far "out of touch".[6] This is what has happened here. The true verdict of the jury, I suspect, is that one should not be acquitted for murder even though he be severely mentally ill.[7]
This act of jury nullification, if in fact this is what has occurred, was not irrational. In most cases where the defendant is in fact severely mentally ill, a not guilty verdict by reason of insanity may nevertheless be wholly contrary to accepted societal ends and human values.
For the security and protection of society, incapacitation of the defendant (via incarceration) may be necessary. An acquittal by reason of insanity may undermine the deterrent effect of the State's scheme of criminal penalties. The accused may be in need of mental treatment to which he will not voluntarily submit. This is particularly true where he needs drug therapy.
That the individual is mentally ill does not necessarily mean that he will not experience and learn from his punishment. Conversely, that the defendant is mentally ill does not alter the societal imperative *305 that serious criminal actions not be deprecated.[8]

D.
There is a practical point that need be noted. An acquittal by reason of insanity would have resulted in Groseclose being committed most likely to the Mississippi State Hospital at Whitfield. While we cannot be certain of this, he would quite likely have been maintained there for treatment for a substantial period of time. Essentially the same thing will happen anyway. The conviction we affirm here means that Groseclose will be held in the custody of the Mississippi Department of Corrections where, I suspect, the same course of treatment for his mental illness will and ought be followed. Beyond that, Groseclose's parole eligibility[9] suggests the possibility that the timing of Groseclose's release back into society will not differ substantially from what would have been the case had he been found not guilty by reason of insanity and committed to the Mississippi State Hospital at Whitfield.

E.
All of these considerations point in a single direction: the abolition of the insanity defense.[10]
The course, which at present appears to have much to commend it, is that consideration of any mental illness from which the defendant may have been suffering at the time of his actions be postponed until sentencing. A criminal trial ought be held for the purpose of determining whether the defendant committed the act with which he had been charged. Whether he was insane seems more relevant to sentence or disposition.[11] All of this would suggest a procedure which is already a part of our Uniform Criminal Rules of Circuit Court Practice. See Rule 5.13. At the conclusion of the guilt phase trial, if the defendant wished to raise the issue of insanity, he could then do so at a separate hearing  but with his proof going solely to the question of what sentence or disposition should be made in his case.
There would be a practical benefit to the procedure contemplated here. Our present procedure places the defendant and his lawyer in an impossible tactical dilemma as trial approaches. Does he deny committing the act charged and, in effect, waive the insanity defense? Or does he concede commission of the act but claim that he was insane at the time? Experienced trial lawyers know the futility of appearing before a jury with alternative theories of defense. Because of this dilemma valid considerations often are not effectively presented to or considered by the jury. Moving the insanity *306 issue to the sentencing phase hearing would allow full and complete consideration of the fact question surrounding guilt or innocence unencumbered by testimony on insanity. In the event of a conviction, the insanity issue could then be developed fully at the sentencing hearing.

F.
I stop short of urging that we now abandon or modify our traditional rules regarding the defense of insanity. In the first place, neither the Defendant nor the State has asked us to make a change. Far more important, however, I am aware of what a major step this would be in our criminal jurisprudence. Where most criminal offenses today require that the state prove criminal intent or specific intent, could we abolish the insanity defense without logically undercutting the intent requirement in so many of our statutes defining crimes?
History tells us that the intent requirement was placed in these criminal statutes in another era. Our perception of the criminal mind and indeed of the human mind are quite different now.
Beyond that, candor requires that we acknowledge that we have consciously invented all sorts of fictions to get around the intent requirement. The malice aforethought necessary to support a conviction of murder need not have existed more than a millisecond prior to pulling the trigger. See, e.g., Carter v. State, 199 Miss. 871, 880, 25 So.2d 470, 473 (1946). While maintaining the fiction that we do not recognize diminished capacity, we have long ago incorporated into the law of homicide, in addition to murder and capital murder, offenses such as manslaughter and negligent homicide. The extent to which these offenses differ from murder, of course, turns on the state of mind at the time the criminal act was done.
I will make no attempt to perceive all of the ramifications of abolition of the insanity defense or to answer the questions posed above. It is sufficient unto this day to say that under the law and the facts, Robert Groseclose stands lawfully convicted of the crime of murder. Like it or not this case starkly illustrates the bankruptcy of the insanity defense. I have tried to articulate some of the reasons for this bankruptcy. It is not acceptable to say we have no better way. The question what we should do I submit must be asked  and answered someday soon.
DAN M. LEE, J., joins in this opinion.
NOTES
[1] Chief Justice Patterson has thoughtfully considered this matter in his concurring opinion in Lias v. State, 362 So.2d 198, 202-203 (Miss. 1978). I commend to the reader the views expressed there.
[2] For a valuable history of the insanity defense, see Harvey v. State, 207 So.2d 108, 110-115 (Miss. 1968), together with the many sources and authorities cited therein. There are a few states which have legislatively overruled the M'Naghten Rule, principally by enacting language taken from the Model Penal Code. See Hill v. State, 339 So.2d 1382, 1389 (Miss. 1976) (S. Robertson, J., specially concurring). In Mississippi the legislature has not enacted on this subject, although it certainly has the power to do so should it so choose. See Miss. Code Ann. §§ 99-13-1, et seq. (1972).
[3] Judicially created rule of law, no matter how long they may have been in existence, are not without our power to change. Pruett v. City of Rosedale, 421 So.2d 1046 (Miss. 1982); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 459-467 (Miss. 1983); Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670, 672 (Miss. 1983). That within constitutional parameters the legislature has the power via enactment to alter what we do is never an acceptable excuse for our abdication.
[4] For a comprehensive survey of the present status of the M'Naghten Rule in the several states, see Annotation, Modern Status of Test of Criminal Responsibility  State Cases, 9 A.L.R. 4th 526 (1981). According to the survey contained in the annotation, 18 states (including Mississippi) cling to the unsullied M'Naghten Rule. The other 32 have modified it in one way or another as have all of the United States Courts of Appeal. See Annotation, Modern Status of Test of Criminal Responsibility  Federal Cases, 56 A.L.R.Fed. 326 (1982).
[5] See, e.g., Justice Stokes Robertson's concurring opinion in Hill v. State, 339 So.2d 1382, 1386-1389 (Miss. 1976), as well as the doubts expressed by Justice Rodgers in Harvey v. State, 207 So.2d 108, 110-115 (Miss. 1968), by Justice Inzer in Jones v. State, 288 So.2d 833, 834-835 (Miss. 1974) and by Justice Broom in Edmond v. State, 312 So.2d 702, 704 (Miss. 1975).
[6] I have discussed the subject of jury nullification in a different yet not altogether unrelated context in my dissenting opinion in Leatherwood v. State, 435 So.2d 645, 660-663 (Miss. 1983).
[7] The point in common parlance is that no jury is going to acquit a dangerous killer, no matter what. As Chief Justice Patterson put it in Lias v. State, supra,

... [I]t is very unlikely that a jury by its verdict would return a multiple killer to the streets even though criminal intention to commit the act was absent. 362 So.2d at 202.
[8] The Hinckley case undergirds what I say here. First, the not guilty by reason of insanity verdict there returned was an aberration. Lawyers in the pits know that generally and across the country insanity defenses fail, no matter what the proof. See Stone, The Insanity Defense on Trial, 33 Harv.L.Sch.Bull. 15, 17 (1982). Experienced criminal defense attorneys employ the insanity defense sparingly, only (1) where the proof of insanity (by any standard) is overwhelming or (2) where no other defense is feasible (and where a guilty plea is infeasible).

More telling in my view is the massively negative public reaction to the Hinckley verdict. The proof in Hinckley's case (which I have cursorily reviewed) strongly supports the jury's verdict. The public's verdict, however, is that anyone who tries to assassinate the President ought be held criminally responsible, no matter what the law is and no matter how strong the evidence of insanity may be.
[9] See Miss. Code Ann. § 47-7-3 (Supp. 1982).
[10] Thoughtful and by no means convergent views on this question may be found in Goldstein and Katz, Abolish The "Insanity Defense"  Why Not? 72 Yale L.J. 853 (1963); Morris, Psychiatry and the Dangerous Criminal, 41 So. Cal.L.Rev. 514 (1968); Dershowitz, Abolishing The Insanity Defense: The Most Significant Feature Of the Administration's Proposed Criminal Code  An Essay, 9 Crim.L.Bull. 434 (1973); Pasewark & Craig, Changing Insanity Plea Statutes, 11 U.C.L.A.  Alaska L.Rev. 173 (1982); Robitscher & Haynes, In Defense Of The Insanity Defense, 31 Emory L.J. 9 (1982); Stone, The Insanity Defense On Trial, 33 Harv. L.Sch.Bull. 15 (1982).
[11] Compare our capital murder statute wherein emotional disturbance and other mental illnesses have been designated mitigating circumstances to be considered at sentencing. Miss. Code Ann. § 99-19-101(6)(b) and (f) (Supp. 1982).