# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00967-COA

**JAMES PATRICK ANDERSON**                                               **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                 **APPELLEE**

DATE OF JUDGMENT:              04/06/2023
TRIAL JUDGE:                  HON. CARMEN BROOKS DRAKE
COURT FROM WHICH APPEALED:    AMITE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       EDWIN L. BEAN JR.
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: SCOTT STUART
DISTRICT ATTORNEY:            SHAMECA SHANTE' COLLINS
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 04/15/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., LAWRENCE AND ST. PÉ, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     James Patrick Anderson was indicted and later convicted by an Amite County jury for the murder of Rahyme Young. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Anderson filed a post-trial motion for a new trial, arguing that the verdict was against the overwhelming weight of the evidence. The motion was denied, and Anderson appealed. After review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2.     On October 11, 2020, Rahyme Young was shot and killed in Magnolia, Mississippi. On August 9, 2022, an Amite County grand jury indicted James Patrick Anderson for the killing, charging him with first-degree murder in violation of Mississippi Code Annotated

section 97-3-19 (Rev. 2020). On October 25, 2022, Anderson filed a motion for discovery. On the same day, counsel for Anderson entered an appearance. On February 3, 2023, Anderson filed a motion for a status conference because a trial date had not been set, and the State filed a motion for reciprocal discovery from Anderson. On February 7, 2023, the circuit court entered an order granting the State's motion for reciprocal discovery. On February 27, 2023, Anderson was arraigned and pled not guilty.

¶3. On March 3, 2023, the State filed a motion in limine to prevent Anderson's post-arrest statement to law enforcement from being introduced at trial. The statement read, "Rahyme Young had an AR15 rifle and Rahyme Young put a gun to his throat." The State also motioned to prohibit the introduction of "the amount of time [Anderson] has been incarcerated prior to trial or the possible sentence [Anderson] may receive if found guilty[.]" On March 8, 2023, the State filed a notice of intent to introduce evidence pursuant to Mississippi Rule of Evidence 404(b)(2). On March 24, 2023, Anderson filed a motion in limine to exclude testimony from the victim's mother as well as "any evidence of facts, circumstances, events, documents for events, or recordings that occurred before October 11, 2020[.]" On March 27, 2023, the circuit judge held a hearing on the matter.[1] On March 28, 2023, the circuit court entered an order prohibiting the State from introducing the "proffered testimony related to the prior bad acts of" Anderson.

¶4. Anderson's trial took place April 4-6, 2023. The State's first witness was Investigator

---

[1] This transcript is not a part of the record on appeal.

Danny Meaux from the Amite County Sheriff's Department. At approximately 10:30 p.m. on October 11, 2020, Meaux responded to a shooting in Magnolia, Mississippi.[2] Upon arrival, he observed the deceased victim (Rahyme) lying on the ground with "a towel on his head" and Rashaad Dozier kneeling next to him. Rashaad had "some blood on him because he was kneeling with the victim and holding the towel, and kind of leaning on him, and talking to him, telling him to hang in there[.]" Meaux spoke with Xuxia Young, the victim's sister and Anderson's step-daughter, who "showed [him] where [the weapon] was located." He found the murder weapon, "a 30-30 Winchester Lever action" rifle, in "a hallway" and photographed it; he then collected it as evidence. The rifle contained one "spent round" and a live round. Meaux testified that firing the weapon would involve at least three steps. Meaux also noted "a puddle of blood" approximately fifteen feet from the carport. The victim's head was "in th[at] vicinity[.]" Anderson was arrested and transported to the sheriff's department and then the jail.

¶5. Meaux interviewed Anderson the following day, "[a]pproximately eight to nine hours after the incident[.]" That interview was recorded and played for the jury. After the video concluded, Meaux explained that while Anderson mentioned in the interview that Rahyme had an AR-15 rifle, Meaux "did not search the whole house, and [he] did not look for any

---

[2] Following jury selection, the court heard an ore tenus motion to allow the inclusion of the 911 call Anderson had made earlier that night about a domestic disturbance. The judge tabled the motion until later in the trial and eventually permitted the 911 call to be introduced into evidence.

other weapons because the witnesses on the scene only told [him] about" the 30-30 Winchester rifle. The interview also referenced the 911 call Anderson had made the night of the crime. The State introduced the 911 call and played it for the jury. In summary, Anderson called 911 concerning a "domestic" situation before the murder occurred.

¶6. On cross-examination, Meaux confirmed that he was informed Anderson was the shooter when he arrived at the scene of the crime. Meaux also stated that he did not "go into a lot of questioning as far as witnesses or suspects" because he had been "told that they had been drinking." The reason for not questioning them further, he stated, is he "let[s] them get a chance to get [the alcohol] out of their systems before [he] talks to" anyone who was intoxicated. He spoke to Rashaad from approximately five feet away for "maybe five minutes." At some point, Anderson stated he "shot in the ground," but Meaux was unable to find a bullet hole in the ground. Meaux was also unable to find a bullet; however, he did find "an indentation where the blood was" in the blood puddle, but he "could not verify if it was a bullet hole or not." Counsel for Anderson also had Meaux confirm that he had interviewed Rashaad and Xuxia the day after the crime as well.

¶7. Meaux also testified on cross-examination that the Mississippi Forensics Laboratory did not run a ballistics check on the recovered rifle and did not take fingerprints from the cartridges. On redirect, he clarified that those tests were not performed "[b]ecause there was no doubt who had the weapon in their hand . . . when it went off." Anderson had admitted in his interview "that the 30-30 in his position [sic] went off while he was holding it[.]"

Further, Anderson "admitted during [his] interview that he put the weapon in the hallway after the weapon went off." Meaux also explained that the crime lab no longer performed gunshot residue tests because they produced false positives, and the shell casing was not sent to the lab because it "was still inside the weapon[;] . . . there was no doubt that weapon fired that shell casing." The State also introduced photographs of the scene, including one of the alleged murder weapon and one of "a puddle of blood" "in the yard from the carport of the house[.]" The jury was also presented with the rifle and the ammunition rounds for viewing along with the document Anderson had signed indicating he was waiving his *Miranda* rights.[3]

¶8. The State called Dr. Staci Turner, a forensic pathologist for Mississippi, as its next witness. Dr. Turner was accepted as an expert witness in forensic pathology with no objection from the defense. She testified that she performed the autopsy on Rahyme at the crime lab and took photos of the body, as is customary. Those photographs were admitted into evidence. Turner testified that "[t]he bullet entered towards the front" of Rahyme's head, "and it went through the skull in that area, went into the brain, went out the skull a little farther back, damaging the brain and causing a lot of damage to the skin and the skull, and actually avulsing some of the skin, bone, and brain tissue."[4] In addition, Turner found no "soot or stippling" present, which generally means the gun was "three feet or farther [away],

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

[4] Turner explained that "avulsing means it was taken away from the body."

or . . . something was between the gun and [Rahyme]'s head." Turner concluded by announcing the cause of Rahyme's death was "a gunshot wound of the head," and the manner of death was "homicide." On Turner's cross-examination, the defense introduced eleven more photographs of Rahyme's body into evidence.

¶9.     At the conclusion of the first day of trial, Anderson made an ore tenus motion for a mistrial. The reasoning was that the assistant district attorney "was talking to [Investigator Meaux], and said when he murdered, not shot, when he murdered [Rahyme]." Counsel for Anderson properly objected at the time "to that characterization." However, the jury had heard the exchange, and Anderson argued that he did not believe "the jury can get that out of the[ir] minds" because it was "a very damning statement." Accordingly, Anderson asserted that not even "a limiting instruction can cure that." The State argued that the jury was not prejudiced by hearing the term "murder" because of the very nature of the case. For that reason, the circuit court denied the motion for a mistrial.

¶10.     The following day, the State called Rashaad Dozier to testify. Rashaad stated that he was engaged to Xuxia and living with her, her mother Shelma Holland, Rahyme, and Anderson at the time of Rahyme's murder. Rashaad stated that on the night of the incident, a cookout was taking place at the home with Anderson, Rahyme, Xuxia, and him. Rashaad was sitting in his room, and "Rahyme called [him] to the kitchen," where the two began arguing with each other. While arguing, the two men "got in each other[']s faces," and Anderson "told [them] to take it outside." Rashaad stated that Anderson "made it clear that

6

he didn't want to be a part of it." He explicitly testified that no weapons were involved during the argument in the kitchen.

¶11.    Rashaad and Rahyme went outside, and Xuxia and Anderson followed. Rashaad stated that he and Rahyme began "to wrestle with each other." Again, he testified that no weapons were outside or present at this time. The State also asked Rashaad to use the previously introduced photographs of the yard to show the jury where everyone had been positioned. Rashaad "eventually got [Rahyme] to the ground" and started talking to him in an attempt "to de-escalate the situation." Rashaad testified that at the same time, Anderson said, "Don't make me go get my shit" three times. Anderson then said to Rahyme, "You're done boy, you're done[.]" Rahyme did not respond to Anderson, instead remaining "focused" on Rashaad. Rashaad testified that by that time, the situation was almost over, and Rahyme "didn't fight [him] as much anymore." Rashaad testified, "I was thinking we could get up in the morning, and talk to each other about it."

¶12.    Rashaad stated he then "recall[ed] seeing the barrel of the gun close to [his] face." Anderson was holding the gun and "pointed it down at Rahyme. . . . [H]e pulled the trigger with no hesitation." The weapon was "[a] 30-30 rifle." Rashaad testified that he "didn't have time to do anything" before Anderson "didn't say a word" and "pulled the trigger." After firing, Anderson "continued to stand over Rahyme" for "at least twelve seconds" before walking "back into the house." Rashaad testified that his own "ears were ringing," and he "thought [he] got shot." When Rashaad realized he was not the one who had been

7

shot, he "got off of Rahyme[.]" Xuxia checked on Rahyme, shining her "phone's flashlight to see if [he] was okay." "[T]here was blood everywhere . . . [, and he] could see the inside of [Rahyme's] skull."

¶13. Rashaad called 911 to report the shooting and "requested an ambulance." On that call with the dispatcher, Rashaad testified, he "told him it was in self-defense" because he "panicked" and had "never seen anybody die" or "get shot in the head." He stated that all he "could remember were the conversations about . . . us protecting the property, standing our ground." Rashaad then stated explicitly that although he panicked and said he shot Rahyme in self-defense on the call, he was "under oath today" and "telling all of you that it was not in self-defense[.] [Anderson] shot this man with no hesitation at all." Rashaad reiterated that neither he nor Rahyme had a weapon during the altercation, and he stated that the only weapon Rahyme even owned was "an air soft gun that shoots plastic pellets." He identified the rifle already entered into evidence as the weapon Anderson used to shoot Rahyme. Anderson kept that rifle "under the bed" and "unloaded" "[f]or protection," and Rashaad had seen him use it before.

¶14. Rashaad then testified that he believed Anderson shot Rahyme "[o]ut of pure jealousy[,]" and "Rahyme was the kind of person that was good at almost everything that he did . . . and it would make [Anderson] feel less than." On cross-examination, Rashaad admitted that he called for Xuxia to get his gun while he was fighting with Rahyme. However, he stated that she did not go retrieve the gun and that "she couldn't have got it"

8

because he locked all the triggers for his guns and had them all in cases, and Xuxia did not know the location of the keys. Rashaad also explained that he only asked Xuxia to bring him a gun in an attempt to "shock [Rahyme] out of it" and did not have any intention of using it even if she brought it. Counsel for Anderson then introduced a sketch Rashaad had drawn for the assistant district attorney of the configuration of the backyard at the time of the shooting. Essentially, Anderson's line of questioning sought to portray Rashaad as a dishonest witness and suggest he was actually Rahyme's killer.

¶15. Following Rashaad's testimony, the court was faced with two separate issues concerning him. First, counsel for Anderson reported a possible violation of Rule 615 of the Mississippi Rules of Evidence, which covers the exclusion of witnesses.[5] He alleged that after Rashaad was escorted to the witness room, which held Xuxia and other witnesses, he spoke with them. The judge questioned both Rashaad and Xuxia to determine if any inappropriate discussion regarding the case had occurred. Ultimately, the judge decided to separate the witnesses but did not penalize them because she did not believe they had spoken about the case. Additionally, one of the jurors reported seeing Rashaad's phone in his pocket during his testimony and believed he was recording the proceedings. The juror was questioned and told by the judge that Rashaad's having his phone did not violate any court

_____

[5] Rule 615 provides that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." MRE 615. The rule was referenced because it was alleged Rashaad spoke with the other witnesses who were not present during testimony about said testimony.

9

rules. After discussion, she was permitted to continue serving on the jury.

¶16.    The State then called Xuxia. On the day of the incident, Xuxia was in the kitchen when Anderson "came up to [her] and he pressed his chest on [her] back, and he put his arms around [her] shoulder[,]" which made her uncomfortable. Rahyme then told Anderson "that [Xuxia] doesn't like it." Anderson "got upset" and "stopped talking." He then went and "stood to the corner." Xuxia testified that no weapons were in the kitchen at that point and that there had been no verbal threats or altercations between Anderson and Rahyme.

¶17.    Xuxia left the kitchen and went to sit with Rashaad. "Shortly after that, Rahyme came to the room, and he asked Rashaad to come . . . into the kitchen[,]" she stated, "[s]o Rashaad followed him out," and the two began talking. When Xuxia heard "their voices raised," she went to the kitchen to find "Rahyme and Rashaad were arguing with each other." Anderson "was off into the corner, [and] he wasn't saying anything." Rahyme and Rashaad "started getting in each other's faces," and Anderson then told them "to take it outside." Xuxia continued, stating that "the two of them went outside [and] started wrestling with each other." She testified again that neither of them had weapons. While they were wrestling, "Rashaad eventually pinned Rahyme to the ground[,] . . . holding him there [and] talking to him."

¶18.    Xuxia stated that Anderson went to call the police. At some point while Rahyme was struggling, she stated that Rashaad told her to go get his gun because he was trying to "snap him out of his anger." Xuxia stated that she walked inside for a moment just to "shock him

10

out of his anger so he could listen to exactly what [they] had to say." She "came right back outside" and had made no effort to actually get a gun for Rashaad. She continued "talking to Rahyme and Rashaad on the ground," and Rahyme was listening and beginning to calm down. Anderson then walked over and started "yelling at [Rahyme] on the ground." Xuxia heard Anderson say, "[H]e's not going to disrespect [my] house, or [my] property"; "[y]ou're done boy, you're done"; and "[d]on't make me go get my shit." Rahyme did not respond. Xuxia heard the "door open and close" while she and Rashaad finished calming down Rahyme. She heard footsteps coming toward them and then saw Anderson "standing right next to Rahyme and Rashaad" and then "point[ing] his gun down" to where they were "on the ground." She stated that Anderson, "without any warning, without saying anything, he just pulled the trigger."

¶19.    Xuxia testified that her "ears [we]re ringing," and her first thought was that Anderson shot Rashaad. She "saw Rashaad move" and began asking Anderson, "[Y]ou shot that into the ground right?" Anderson "didn't say anything" and "just stood there for a bit with the gun still pointed down" before walking back into the house. Xuxia turned on her phone's flashlight and saw "blood on the ground" and blood "coming out of [Rahyme's] head." Rashaad went to call the police, and Xuxia went inside to get a towel to put on Rahyme's head. "[H]e was just breathing" when she put it on him and waited for the police to arrive. She stated that Anderson "never came back out to check if everyone was okay" and "only came back out when the police took him away." The State had Xuxia explain where

11

everyone was positioned in the photographs of the yard and identify Anderson's weapon as the one used to kill Rahyme. On cross-examination, she stated that Rahyme had drunk some alcohol that night. Counsel also had Xuxia draw her own sketch for the jury of everyone's position at the time of the murder. Following Xuxia's testimony, the State rested its case. Anderson moved for a directed verdict immediately afterward, and the circuit court denied the motion due to the eyewitness testimony that had been provided. The defense then rested its case. The jury was presented with instructions for the crimes of first-degree murder, second-degree murder, and manslaughter by culpable negligence.

¶20. On April 6, 2023, the jury returned a verdict, finding Anderson guilty of first-degree murder. Anderson's sentencing hearing took place immediately, during which both of Rahyme's parents gave in-person victim impact statements. Rahyme's parents, Xuxia, and Rashaad also filed written impact statements with the court. That same day, Anderson was sentenced to serve a term of life imprisonment in the custody of the MDOC. On April 17, 2023, Anderson filed a motion for a new trial, arguing the jury's verdict was contrary to the weight of the evidence. The motion was denied, and Anderson appealed.

## STANDARD OF REVIEW

¶21. This Court reviews the denial of a "motion for a new trial under an abuse-of-discretion standard of review." *Johnson v. State*, 50 So. 3d 335, 340-41 (¶26) (Miss. Ct. App. 2010) (citing *Hill v. State*, 912 So. 2d 991, 994 (¶19) (Miss. Ct. App. 2004)). "Whether to grant or deny a motion for a new trial is in the trial court's sole discretion." *Id.* "When reviewing a

weight-of-the-evidence challenge, our role as an appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Goode v. State*, 374 So. 3d 592, 606 (¶35) (Miss. Ct. App. 2023) (quoting *Eaton v. State*, 359 So. 3d 1081, 1086-87 (¶22) (Miss. 2023)).

## ANALYSIS

¶22. Anderson's sole argument on appeal is that the jury's verdict was against the overwhelming weight of the evidence. When addressing a weight of the evidence argument, the Mississippi Supreme Court has instructed that neither it "nor the Court of Appeals sits as thirteenth juror." *Id.* at 606-07 (¶36) (quoting *Little v. State*, 233 So. 3d 288, 292 (¶19) (Miss. 2017)). This Court will neither "make independent resolutions of conflicting evidence[, n]or [will] we reweigh the evidence or make witness-credibility determinations." *Id.*

¶23. "[T]he jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness." *Gray v. State*, 828 So. 2d 1287, 1290 (¶10) (Miss. Ct. App. 2002) (quoting *Meshell v. State*, 506 So. 2d 989, 991 (Miss. 1987)). The circuit court instructed the jury on this key role entrusted to them, stating:

> In weighing a discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or a deliberate falsehood, and whether it pertains to a matter of importance or an unimportant detail. You may reject or accept all or any part of a witness' testimony, and you may reject part and accept other parts of a witness' testimony. The weight of the evidence is not necessarily determined by the number of witnesses

13

testifying as to the existence or non-existence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

As for which witness or piece of evidence the jury found most persuasive, "[a] reviewing court **cannot and need not** determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict." *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983) (emphasis added) (quoting *Gandy v. State*, 373 So. 2d 1042, 1045 (Miss. 1979)). "It is enough that the conflicting evidence **presented a factual dispute** for jury resolution." *Id.* (emphasis added).

¶24. In Anderson's case, multiple pieces of evidence and testimonial evidence "presented a factual dispute for jury resolution." *Id.* The State presented two eyewitnesses to the shooting—Rashaad and Xuxia—who both recounted the series of events from that night in detail for the jury. Both eyewitnesses stated that no one else had a weapon at the time of the shooting, Anderson went inside to retrieve his weapon, and Anderson shot Rahyme. Both eyewitnesses were cross-examined, and counsel for Anderson attempted to show that they were dishonest, withholding certain facts, and that Rashaad was the actual shooter. Additionally, Investigator Meaux testified as to the findings of his investigation in the case, and the video recording of his interview with Anderson was played for the jury. In that recording, Anderson admitted that he was the one who shot Rahyme. The jury also heard Rashaad's 911 call, which Anderson used to purport that Rashaad was the actual shooter. Finally, the murder weapon was identified by Investigator Meaux, Rashaad, and Xuxia and

14

made available for the jury's viewing.

¶25. No formula exists that "dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict." *Groseclose*, 440 So. 2d at 300 (quoting *Gandy*, 373 So. 2d at 1045). It is sufficient to show there was a "factual dispute" for the jury to resolve. *Id.* The jury in this case was presented with evidence both in favor of and against a guilty verdict. As such, the verdict was not contrary to the overwhelming weight of the evidence.

## CONCLUSION

¶26. This Court does not sit as a "thirteenth juror." *Goode*, 374 So. 3d at 606-07 (¶36) (quoting *Little*, 233 So. 3d at 292 (¶19)). We find that the verdict was not contrary to the overwhelming weight of the evidence, and allowing it to stand does not "sanction an unconscionable injustice." *Id.* (quoting *Eaton*, 359 So. 3d at 1086-87 (¶22)). Therefore, there was no abuse of discretion by denying Anderson's motion for a new trial. This Court affirms Anderson's conviction and sentence.

¶27. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**

15