# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01117-COA

**COREY ANTIONE JONES A/K/A COREY JONES A/K/A COREY ANTIONE JONES, JR.**　　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/28/2022 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | COREY ANTIONE JONES (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/19/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.　A 23-year-old man messaged another user on a dating app. He was quickly told she was underage. Nonetheless, the man requested nude photographs and that the girl meet him for sex. But when the man arrived at their rendezvous, he discovered the girl was actually an undercover law enforcement officer. The man was arrested. He was subsequently convicted of two counts of child exploitation.

¶2.　On appeal, he claims he was entrapped by the authorities, and that his convictions were against the overwhelming weight of the evidence. Finding no error, we affirm.

**FACTS**

¶3.    Hernando Police Detective Michael Hansbro worked as an undercover agent tasked with investigating child exploitation cases. On multiple dating websites, he would often use the persona of "Amy," an underaged girl. In an effort to thwart child exploitation, the website "Plenty of Fish" allowed the detective to maintain his undercover profile even if other users reported him as underage. A 911 dispatcher for the Department would often aid the detective by providing him pictures from her youth and making voice recordings, phone calls, or even video-chatting using FaceTime when needed.

¶4.    One day, Detective Hansbro received a message from Corey Jones on the Plenty of Fish profile. After exchanging a few messages, "Amy" disclosed to Jones that she was "younger than her profile." Jones asked if "Amy" was "under 17," to which she replied with a thumbs-up emoji. Jones then responded, "K," and the conversation ended.

¶5.    Two days later, on the evening of August 18, 2020, Jones again initiated conversation with "Amy" asking what she was doing that night. The conversation continued for some time and eventually resulted in the following exchange:

Jones:        Want some company? Lol

"Amy":        Thought I was too young for ya.

Jones:        Will u get in trouble?

"Amy":        Long as mom doesn't know. Lol. She would have my little 14
              yr old ass.

Jones:        Well how would u sneak out? I'm in an 18 wheeler.

. . . .

Jones:        Lol and where would I park this big think [sic] so that they

2

won't see me?

"Amy": I could walk up the road to the gas station. U can't get an 18 wheeler in my trailer park.

¶6. After agreeing to meet at a gas station in Hernando, Jones gave "Amy" his phone number and asked her to send him "some nudes" to prove that he could trust her. Instead, Detective Hansbro instructed the 911 dispatcher to have "Amy" send Jones a voice message. Still apprehensive, Jones persisted in his pursuit of urging "Amy" to send "a sexy image" of herself to him. At that time, the conversation moved from the dating app over to text messages on the parties' respective cell phones.

¶7. Throughout the course of the text chain, Jones incessantly asked "Amy" to send him nude photographs. Each time "Amy" declined. Jones then asked her to video-chat him for five seconds. "Amy" agreed to do so but without the video on, claiming her mother "smashed" her phone and "bust[ed]" the camera. The 911 dispatcher played the role of the girl again:

Jones: So how come you just can't send a nude?

"Amy": 'Cause wouldn't you rather see it in person?

Jones: I would rather see it in person but I gotta trust you first. All you gotta do is send one and I'll delete it then come see you.

"Amy": Well how am I going to trust you if you don't trust me?

. . . .

Jones: That's because you're young. I can't do nothing with your pictures or else I'll be in trouble. I can't do nothing with your pictures because it would be illegal and I would go to jail for a long time.

¶8.     The text conversation continued and Jones asked "Amy" if she was going to "sneak out the window" to meet him at the gas station.  During the hours of messaging, "Amy" told Jones that her "mom monitors [her] calls," and she can not have social media until she turns 16.  Concerned about her mother, Jones also asked her how she knew her mother wouldn't "knock in [sic] your door" or "go in your room."  "Amy" replied that her mother never does and then eventually asked what she and Jones were going to do once they both got to the gas station.  Jones texted they were going to have "fun" but that she "already [knew]" what they were going to do.

¶9.     After some back and forth, Jones wrote "No f*** for you then," when it seemed "Amy" was backing out.  After asking if he should still come, "Amy" agreed to meet Jones at the gas station, and Jones replied that he was on his way and that it would "take [him] 37 min."

¶10.    Once Jones arrived at the gas station, Detective Hansbro and other officers arrested him.  Jones was indicted for two counts of child exploitation.

**PROCEDURAL BACKGROUND**

¶11.    At trial, the State called two witnesses: the 911 dispatcher and the detective.  The recorded call between Jones and "Amy" was played for the jury during the dispatcher's testimony.

¶12.    Detective Hansbro testified next.  He explained to the jury the Department's ultimate goal when investigating child exploitation cases, his training, and the rules and procedures he was required to follow.  Detective Hansbro disclosed that he received training every year

4

since he began investigating child exploitation cases in 2020.

¶13.    When asked about the general rules and procedures a detective must follow in a child exploitation case, the detective told the jury that he has "to operate within ICAC [Internet Crimes Against Children] standards." Those standards "allow us to create undercover personas" with "written permission from the persona we want to use," provided they are "an employee of a law enforcement entity." From there, he explained how they create a profile but added that any potential suspect must be the one to "initiate the chats" and essentially "lead the whole conversation."

¶14.    The witness next told the jury the undercover personas being used "have to say how old [they] are" at least twice. He would often allude to his persona's age by referencing an inability to drive yet or mentioning his persona's mother to show she still has "some kind of control over the child." But Detective Hansbro disclosed that he gives any potential suspect several "exit opportunities" during these exchanges to give them a chance to end the conversation.

¶15.    Detective Hansbro testified that Jones initiated conversation with "Amy" and then identified Jones in the courtroom as the same man who exchanged messages with "Amy" and showed up at the gas station in an 18-wheeler. He pointed out Jones stopped messaging with "Amy" after first discovering she was underage, but Jones chose to re-initiate conversation again a couple of days later. He disclosed that he made Jones aware of "Amy's" age at least three different times. Jones was also given multiple "exit opportunities" throughout the conversation.

5

¶16. After the State rested its case, the defense moved for a directed verdict, arguing the State failed to present a prima facie case of child exploitation. Viewing all the evidence in the light most favorable to the State, the trial court denied the motion as to both counts.

¶17. The trial court then asked Jones, "[I]t's your desire to waive your rights to silence and testify on your own behalf?" Jones replied, "Oh, yes, ma'am," and subsequently took the stand. Jones testified that he was familiar with his conversation with "Amy" and did not deny that the communications were from him. However, he stated that he "knew" he was not speaking with a child because "they seemed to be too smart." And he said that in "all [his] app history," he had never come across anyone who was under the age of 18.

¶18. Jones disclosed that he messaged "Amy" first. When asked about his request for nudes and his reasoning for requesting them, Jones testified that he "started just playing" because he could not "go wrong if they send nudes" since that would allow him to determine whom he was actually messaging. He was then asked why he chose to continue on with the conversation, to which he responded, "Because curiosity killed the cat," and that it was "called being thirsty, not a pervert."

¶19. But Jones testified that he was not going to "sit here and act like [he] knew the law," so if a 14-year-old would have sent him "a picture of anything even borderline inappropriate," he "would have acted like [he] didn't see it" and "would have deleted the whole thing." Jones maintained throughout the entirety of his testimony that he "knew" who he was speaking to "wasn't a kid."

¶20. Ultimately, the jury found Jones guilty of both counts of child exploitation. He was

6

sentenced to serve two concurrent eight-year terms in the custody of the Mississippi Department of Corrections followed by five years of post-relief supervision. The trial court denied his motion for judgment notwithstanding the verdict or a new trial. Jones appealed, raising two issues through counsel and four additional issues in a supplemental pro se brief.

## DISCUSSION

### I. The entrapment instruction was properly rejected.

¶21. Jones argues that the trial court erred in refusing to instruct the jury that he was entrapped. Specifically, he contends that the evidence presented at trial was sufficient to support a prima facie showing of his entrapment defense.

¶22. "The long-standing standard of review for the trial court's giving or refusing jury instructions is an abuse of discretion." *Clay v. State*, 345 So. 3d 628, 630 (¶8) (Miss. Ct. App. 2022). "When reviewing the giving or refusal of jury instructions, we do not view the jury instructions in isolation, but instead we consider them as a whole." *Id.* (citing *Rushing v. State*, 911 So. 2d 526, 537 (¶24) (Miss. 2005)). Although "[a] defendant is entitled to have jury instructions given which present his theory of the case . . . this entitlement is limited in that the court may refuse an instruction which [1] incorrectly states the law, [2] is covered fairly elsewhere in the instructions, or [3] *is without foundation in the evidence*." *Clayton v. State,* 106 So. 3d 802, 804 (¶6) (Miss. 2012) (emphasis added) (citing *Bailey v. State*, 78 So. 3d 308, 315 (Miss. 2012)).

¶23. Mississippi Code Annotated section 99-1-25(1) (Rev. 2020) allows for "an affirmative defense to a criminal charge that the person was entrapped." "To claim entrapment, the

person must admit by the person's testimony or other evidence the substantial elements of the offense charged." *Id.* Notably, "[a] person who asserts an entrapment defense has the burden of proving each of the following [elements] *by clear and convincing evidence.*" *Id.* § 99-1-25(2) (emphasis added). The elements are:

> (a) The idea of committing the offense was initiated by law enforcement officers or their agents rather than by the person.
>
> (b) The law enforcement officers or their agents urged and induced the person to commit the offense.
>
> (c) The person was not predisposed to commit the type of offense charged before the law enforcement officers or their agents urged and induced the person to commit the offense.

*Id.*[1]

¶24. Mississippi law makes clear that an entrapment defense cannot be established "if the person was predisposed to commit the offense and the law enforcement officers or their agents merely provided the person with an opportunity to commit the offense." *Id.*

---

[1] The entrapment statute codifies what was formerly longstanding precedent that "one who denies the act which constitutes entrapment cannot afterwards claim entrapment as a defense." *Daniels v. State*, 422 So. 2d 289, 291 (Miss. 1982), *abrogated by Hopson v. State*, 625 So. 2d 395 (Miss. 1993). However, in 1993 *Hopson* "abolish[ed] that requirement," following a line of federal cases that acknowledge "the entrapment defense was available to a defendant even though he or she denied committing the acts upon which the criminal charge is based." *United States v. Ivey*, 949 F.2d 759, 768 (5th Cir. 1991) (citing *Mathews v. United States*, 485 U.S. 58, 62 (1988) (holding "that even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment").

In 2005, the Legislature enacted the entrapment statute, which has not been altered since. The title of the bill expressly noted the statute was drafted to "RESTRICT THE AVAILABILITY OF THE DEFENSE." 2005 Miss. Laws ch. 463, § 7 (S.B. 2235). The enactment of the statute effectively overruled *Hopson*, re-instituting the requirement that a defendant first admit the offense.

§ 99-1-25(3). "Law enforcement officers or their agents merely using a ruse" or "conceal[ing] their identity" does not constitute entrapment. *Id.*

¶25. We have recently examined a similar case where a defendant claimed entrapment. *Turner v. State*, 276 So. 3d 1224, 1228 (¶15) (Miss. Ct. App. 2018). In *Turner*, a detective posed as a 15-year-old boy to combat internet crimes against children. *Id.* at 1225-26 (¶¶2, 4). After responding to an advertisement posted by the "15-year-old boy," the defendant and the detective began conversing. *Id.* at 1226 (¶4). The "boy" disclosed that he was 15 years old and that his "parents [wouldn't] be home until late [that] evening," and the defendant asked for his address. *Id.* The two agreed to meet, and once the defendant arrived at the agreed-upon location, he was arrested. *Id.* at (¶5). Like this case, the defendant was found guilty of child exploitation. *Id.* at 1227 (¶8).

¶26. On appeal, the defendant argued that "the trial court erred in refusing his proposed jury instruction on entrapment." *Id.* at (¶9). However, we found there was ample evidence the defendant "was told" and "admitted knowing, that the individual with whom he was conversing described himself to be fifteen years of age." *Id.* at 1228 (¶14). In fact, there were "several instances" in which the defendant was made aware he was speaking to a child, "and yet he persisted." *Id.* at 1229 (¶17). As such, we held "nothing in the record support[ed] Turner's claim for an entrapment instruction." *Id.* at 1228 (¶15).

¶27. Similar to the defendant in *Turner*, the record does not support Jones's claim for an entrapment instruction. Jones admitted he exchanged messages with "Amy." Not only did he initiate conversation with her, but he was expressly made aware of her age on at least

9

three different occasions. "Amy" alluded to being a minor at least nine different times in the messages with Jones, including repeatedly referencing how her mother monitors her phone use and forbade her to have social media until she was 16. She also told Jones she would have to sneak out of her bedroom window to meet him.

¶28. At trial, Detective Hansbro explained the requisite rules and procedures he must follow during investigations, and he indicated that he gives suspects several "exit opportunities" during the conversation. Jones was provided an "exit opportunity" when he asked "Amy" if she was "[u]nder 17," and she responded with a thumbs-up emoji. Despite knowing she was underage, Jones still chose to send another message to "Amy" two days later. The record reflects Detective Hansbro gave Jones at least five different "exit opportunities" in which he could have ended the conversation with "Amy." Instead, Jones repeatedly continued the conversation.

¶29. Nonetheless, Jones maintained that he "knew" he was not speaking to a child. But that runs contrary to his acknowledgment that it would be "illegal" to do anything with the nudes he requested from "Amy," as he "would go to jail for a long time." The statute requires a defendant to prove three elements "by clear and convincing evidence" before the entrapment defense can be used. Given the evidence at trial, we cannot say that Jones provided such proof.

¶30. Just as we concluded in *Turner*, we find the trial court was within its discretion to reject the proposed entrapment instruction.

## II. The verdicts were not against the overwhelming weight of the evidence.

10

¶31. Jones next argues that the overwhelming weight of the evidence showed that he essentially lacked the requisite intent because he did not believe "Amy" was underage.

¶32. "'Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Jones v. State*, 369 So. 3d 1006, 1010 (¶12) (Miss. Ct. App. 2023) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)).

¶33. On appeal, Jones contends he was not necessarily trying to elicit any kind of sexual response from "Amy" by asking for nude photographs—instead, he claims he only wanted to learn the identity of the person he was messaging. During his trial testimony and in the briefs before this Court, Jones protests he knew "Amy" was not actually a child and that he had no interest in children. And through counsel, Jones argues that "asking for a nude photo, in and of itself, does not beyond a reasonable doubt constitute a request for sexually explicit conduct."

¶34. In contrast, the volume of Jones's communications with "Amy" show otherwise. Despite multiple "exit opportunities," Jones continued to not only ask for nudes but actually made plans to meet up and have sexual relations with a person who repeatedly identified themselves as underage. Over and over, "Amy" described how her mother controlled her phone use, how she was unable to have social media until she was 16, and how in order to meet Jones at the nearby gas station she would have to sneak out of her window and walk.

¶35. It is well-settled that the fact-finders "may believe or disbelieve, accept or reject, the

11

utterances of any witness." *Johnson v. State*, 276 So. 3d 1195, 1200 (¶21) (Miss. Ct. App. 2018) (quoting *Gandy v. State*, 373 So. 2d 1042, 1045 (Miss. 1979)). The jury was empowered to decide whether Jones was only trying to figure out who he was talking to—as he contends—or whether he knew or believed "Amy" to be underage and was seeking to have sexual relations with her.

¶36. The jury saw a wide volume of messages from Jones to "Amy" and other corroborating evidence, such as Jones actually showing up at the gas station and the recorded FaceTime audio. Therefore, we find the verdicts were not against the overwhelming weight of the evidence.

### III. Pro Se Issues

¶37. As allowed by our Rules of Appellate Procedure, Jones filed his own pro se brief on July 31, the State responded, and he filed a reply.[2]

¶38. Jones argues he suffered a violation of his right not to incriminate himself, protests the trial transcript was not complete, and claims he was deprived of effective counsel. We address each point in turn.

#### a. Incrimination

---

[2] After he filed his supplemental brief, Jones filed two additional documents he titled "Addendum," and further filed two more such documents after his reply to the State. Jones did not seek permission before filing these documents. Because the four additional documents do not conform with the briefing schedule or our Rules, we do not consider them. *See* MRAP 28(b) (allowing the filing of a singular "pro se supplemental Brief of the Appellant," which "may address issues not raised by counsel, but such issues must be based on the record"). To the extent they raise new issues not preserved in the principal briefs, they are procedurally barred, for as a general rule, our appellate courts "do[] not consider issues raised for the first time in an appellant's reply brief." *Biegel v. Gilmer*, 329 So. 3d 431, 433-34 (¶11) (Miss. 2020).

¶39.   Jones first argues that his right against self-incrimination was violated because to claim entrapment "requires that [he] testify[] and admit [his] guilt."

¶40.   Jones is correct that "[t]o claim entrapment, [he] must admit by [his] testimony or other evidence the substantial elements of the offense charged."  Miss. Code Ann. § 99-1-25(1).  But the trial court found that Jones had not made such admission.  In fact, the trial court found that Jones

> [r]outinely said he knew it was the police.  He never thought the person was underage.  He thought that they were older.  If they had been underage, he would have cussed them out.  He wouldn't have told the police but I don't think he's met the entrapment defense[.]

Jones was not forced into conceding this point, as he claims; indeed, his primary defense was that he never believed he was speaking to a minor.  Furthermore, his counsel's closing argument was that "the reason these requests and conversations continued was because he never thought it was a minor."  And as set out above, to assert an entrapment defense at trial, the statute first requires that a defendant "admit by the person's testimony or other evidence the substantial elements of the offense charged."  *Id.*  Since Jones chose not to do that, the defense was not available to him at trial.

¶41.   Nonetheless, such evidence was for the jury to "believe or disbelieve, accept[,] or reject."  *Johnson*, 276 So. 3d at 1200 (¶21) (quoting *Gandy*, 373 So. 2d at 1045).  The jury chose to reject his defense and was well within its power to do so.

¶42.   Jones also contends he was not able to review all the evidence against him and that he was "not present" when certain evidence was shown to the jury.  He specifically highlights the FaceTime audio on this point and claims that had he seen it prior to trial, he would not

13

have testified. Notably, before testifying, the trial court expressly asked Jones: "[Y]ou've been in here and listened to all of the proof; is that correct?" He responded, "Yes, ma'am." Yet when the State moved to enter the recording into evidence, his attorney made no objection, so this issue is waived.

¶43. Further, under Mississippi Rule of Evidence 801(d)(2)(A), a statement "offered against an opposing party" that "was made by the party in an individual or representative capacity" is not hearsay. Therefore, because the audio captures Jones speaking, and he did not dispute it was his voice on the recording, it is an admission by a party opponent and was properly allowed.

### b. Inaccurate / Incomplete Transcript

¶44. Next, Jones claims portions of the transcript do not reflect some of his testimony—that he "didn't flat out admit to the messages."

¶45. However, the court reporter certified the transcript as accurate. *See* MRAP 11(c) ("the reporter shall certify the transcript as an accurate account of the proceedings and file the original and one copy of the transcript with the clerk of the trial court"). Under Mississippi law and precedent, this means the transcript is presumed correct. *See* Miss. Code Ann. § 9-13-43 (Rev. 2019) ("When a transcript has been made by the official reporter and certified to as being a correct transcript . . . the same shall be prima facie a correct statement thereof"). "Certification imports absolute authority, and the certified record is the sole evidence of the proceedings below." *Rotwein v. Holman*, 529 So. 2d 173, 175 (Miss. 1988).

¶46. Furthermore, Jones never sought to correct, modify, or supplement the transcript as

14

allowed by our Rules. *See* MRAP 10(e) (requiring disputes over "whether the record truly discloses what occurred in the trial court" to be "submitted to and settled by" the trial court "and the record made to conform to the truth," and that omissions or accident are to be corrected below as well); *see also* MRAP 10(b)(5) (providing time to review the record and determine if it is complete or requires correction). Therefore, we find this issue is waived.

### c. Ineffective Assistance of Counsel

¶47. Jones raises a variety of issues with the performance of his trial and appellate counsel. The State does not agree the record is adequate to address the issues. Accordingly, we dismiss these claims without prejudice so that Jones may raise them later in a properly filed motion for post-conviction relief if he so chooses. *See generally Ellison v. State*, 370 So. 3d 807, 815 (¶35) (Miss. Ct. App. 2023) ("Because this issue involves our consideration of matters outside the content of the record, we dismiss [the] claim of ineffective assistance of counsel without prejudice to his right to seek permission from the supreme court to revisit the issue in a motion for post-conviction relief if he so chooses").

### CONCLUSION

¶48. For the reasons set out above, we find it was not an abuse of discretion for the trial court to reject the jury instruction on entrapment as Jones failed to offer clear and convincing evidence supporting such a defense. Further, we find the overwhelming weight of the evidence was not against the two convictions of child exploitation. Finally, we find the remaining issues raised by Jones in his supplemental pro se brief do not warrant reversal. Therefore, we affirm his convictions and sentences.

¶49.	**AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**