# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00313-COA

**CAMARA JOHNSON** APPELLANT

v.

**STATE OF MISSISSIPPI** APPELLEE

DATE OF JUDGMENT: 01/30/2017
TRIAL JUDGE: HON. CAROL L. WHITE-RICHARD
COURT FROM WHICH APPEALED: WASHINGTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER
BY: BENJAMIN ALLEN SUBER
    GEORGE T. HOLMES
    ERIN E. BRIGGS
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY: WILLIE DEWAYNE RICHARDSON
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED: 08/14/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., WILSON AND TINDELL, JJ.**

**TINDELL, J., FOR THE COURT**:

¶1. Camara Johnson, Cordale McCarty, and Marquis McKinney were all indicted for crimes related to the May 2, 2014 shooting of Ervin Simmons and Trasharria Mitchell. After trial, a Washington County jury found Johnson guilty of the first-degree murder of Simmons and the aggravated assault of Mitchell. The jury also found that Johnson used or displayed a firearm during the commission of these crimes which, by statute, required the addition of five years to his sentence. *See* Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014); Miss. Code

Ann. § 97-3-7(2)(a) (Rev. 2014); Miss. Code Ann. § 97-37-37 (Rev. 2014). On January 27, 2017, the Washington County Circuit Court sentenced Johnson to concurrent terms of life imprisonment for first-degree murder, twenty years for aggravated assault, and five years for the firearm enhancement. On February 3, 2017, Johnson's attorney filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial, which the trial court denied. On appeal, Johnson claims the trial court erred in denying his motion for a new trial because the jury's verdict was against the overwhelming weight of the evidence. Finding no error, we affirm Johnson's convictions and sentences.

## FACTS

¶2. On May 2, 2014, Simmons was shot and killed, and Mitchell was shot and injured in the parking lot of Simmons's night club, The Meeting Place.[1] About a month before the shooting, a fight occurred at the club between Johnson, McKinney, and McCarty (the group), and Simmons.[2] Because of the fight, Simmons banned the group from the club. McCarty and Mitchell testified that although they were angry about the ban, the group continued to loiter around the club's parking lot.

¶3. McCarty testified that on the evening of the shooting, he, Johnson, and McKinney parked their vehicle and drank beverages in or near the club's parking lot. He testified that

_____

[1] Mitchell was Simmons's girlfriend and assisted him in the operation of his night club.

[2] Johnson, McKinney, and McCarty were members of a group who identified themselves as "400 block" because they were from the 400 block of Inez.

2

when Simmons and Mitchell arrived at the club that evening, some verbal interaction occurred between Simmons, Mitchell, and the group. The group left because Simmons advised them they were not supposed to be at the club. McCarty was also concerned Simmons would call the police. After this encounter, and sometime before 3 a.m. on May 2, 2014, Simmons began the nightly process of closing the club. Mitchell moved Simmons's truck to the club's side-door where Simmons usually exited the club after closing. Mitchell parked the truck near the side-door and slid from the driver's seat to the middle of the truck's front seat to wait on Simmons.

¶4.     As Simmons headed toward his truck after locking up the club, Mitchell saw two people come from behind a trash can at the corner of the club. The two people screamed, "I got you now, n*****," and both started shooting. Mitchell recognized McKinney as one of the shooters, but she did not recognize the other shooter. Mitchell saw McKinney in front of Simmons's truck aiming a gun at her. Mitchell testified that McKinney shot her from his place in front of the truck, moved, and shot her again from the driver's side door. She recalled being shot one more time after that. Mitchell could not recall if McKinney was the only one who shot her. She testified that she heard many shots but did not see Simmons get shot. Although two bullets remain inside her, Mitchell recovered from her extensive injuries.

¶5.     Melvin Mitchell, the club's bouncer, testified that, on May 2, 2014, after leaving the club shortly before Simmons closed it, he heard loud noises, saw the police in the area, and drove back to the club. There he found Simmons's truck with the driver's side-door open

3

and Mitchell inside the truck bleeding and in pain. Melvin found Simmons dead, face-up, and with the upper half of his body under the truck.

¶6. Melvin testified that the group and others, who were earlier banned from the club, identified themselves by wearing shirts imprinted with "400 block of Inez." Although he did not know the group members by their personal names, Melvin knew their street names and their faces. He knew what others called the group and testified about what the group called itself. Melvin identified Johnson as one of the "400 block" group members banned from the club.

¶7. Simmons was shot multiple times: one time through his face, at least three times in his torso, and at least once in his leg. Simmons's clothes were bloody, his pants were pulled down, and the pockets of his pants were turned out. The deputy-chief medical examiner, Dr. Brent Davis, performed Simmons's autopsy and determined that Simmons died from multiple gunshot wounds. Dr. Davis determined the manner of Simmons's death to be a homicide.

¶8. Several days after the shooting, the police arrested McCarty, who confessed. McCarty's confession placed McKinney and Johnson at the crime scene. McCarty delineated his version of the events and included statements he said McKinney and Johnson made to him. The police also arrested Johnson and McKinney. Johnson, McCarty, and McKinney were indicted for capital murder, attempted murder, and conspiracy to commit robbery. McKinney and McCarty entered into plea agreements with the State.

4

¶9. At Johnson's trial, McCarty testified as a State's witness. A part of McCarty's plea agreement required him to testify against Johnson. McCarty testified about the events leading up to the shooting, confessed to his own involvement, and testified that Johnson admitted to shooting Simmons.

¶10. McCarty specifically testified that after leaving the club earlier that night, McKinney and Johnson said that Simmons "was the business." When asked what that description meant, McCarty explained it meant something was going to happen to Simmons—that McKinney and Johnson were "fixing to go kill [Simmons]." McCarty testified that, while at McCarty's house, McKinney and Johnson changed into dark clothes to go back to the club "[b]ecause [Simmons] was fixing to be the business." McCarty testified that they left his house at 2 a.m. and that when they left, McKinney had a revolver and Johnson had an automatic handgun.

¶11. On the way back to the area near the club, McCarty testified Johnson and McKinney were talking and repeated that "[Simmons] was the business." Nearing the area, McCarty dropped McKinney and Johnson off across the highway from the club. He testified that McKinney and Johnson still had their guns. McCarty parked the truck and waited for McKinney and Johnson to return. McCarty testified that shortly thereafter he heard gunshots and that both McKinney and Johnson returned tired and sweating. McCarty testified that Johnson came back to the truck with the automatic handgun and said, "I got him. I killed him." McKinney and Johnson told McCarty that Simmons had been shot.

5

¶12. The next morning McCarty packed clothes to go out of town because he thought the police were coming to get him. He stayed in the country for two or three days before police arrested him. Later, McCarty wrote out an affidavit disclaiming his confession, and he stated that the police paid him for his testimony against McKinney and Johnson. However, as part of his plea agreement, McCarty agreed to testify against Johnson and recant his affidavit statements. McCarty wholly recanted his affidavit in sworn-trial testimony and testified that he lied in the affidavit, trying "to get out of jail."

¶13. After deliberation, the jury found Johnson guilty of the first-degree murder of Simmons, the aggravated assault of Mitchell, and found him entitled to a firearm enhancement. On appeal, Johnson argues the testimony from McCarty, a co-defendant, and admitted liar, improperly swayed the jury. He therefore asks this Court to disregard the jury's verdict and grant him a new trial.

## STANDARD OF REVIEW

¶14. When this Court reviews a trial court's denial of a motion for a new trial, based on a challenge to the weight of the evidence, we review the court's decision for an abuse of discretion. *Washington v. State*, 220 So. 3d 972, 973 (¶6) (Miss. 2017). In so doing, we should "only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (¶4) (Miss. 2017)). A new trial should be granted "only in exceptional cases where the evidence

preponderates heavily against the verdict." *Lindsey*, 212 So. 3d at 45 (¶4).

## DISCUSSION

¶15.    Johnson contends that both a lack of evidence and the lack of believable evidence invalidate the jury's verdict and entitle him to a new trial.  Johnson correctly asserts that the evidence against him consisted, in part, of testimony provided by a co-defendant, McCarty. He claims that McCarty's testimony is uncorroborated, is the questionable product of a plea agreement, and is unbelievable.

¶16.    However, the fact that the evidence against a defendant consists of his co-defendant's testimony is alone not a ground to grant a new trial.  *Osborne v. State*, 54 So. 3d 841, 846-47 (¶¶22-25) (Miss. 2011).  Even taken alone and uncorroborated as Johnson argues, McCarty's testimony "may be sufficient to convict an accused."  *Id.* at 846 (¶22) (quoting *Ballenger v. State*, 667 So. 2d 1242, 1253 (Miss. 1995)).  Although the Mississippi Supreme Court holds this rule "inapplicable in those cases where the testimony is unreasonable, self contradictory or substantially impeached," we note that sworn testimony carries a strong presumption of truth.  *See id*. at 843 (¶5); *Baker v. State*, 358 So. 2d 401, 403 (Miss. 1978).

¶17.    Our review leads us to conclude that McCarty's sworn trial testimony and his recantation of his affidavit provided at the very least one explanation of the evening's events for the jury's consideration.  If a co-defendant's testimony is not corroborated and the accused requests a cautionary jury instruction, the instruction is required.  *Williams v. State*, 32 So. 3d 486, 492 (¶20) (Miss. 2010).  Mississippi law "does not impose upon a trial court

7

a duty to instruct the jury sua sponte. . . ." *Conner v. State*, 632 So. 2d 1239, 1254 (Miss. 1993) (overruled on other grounds by *Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999)). Therefore, when an accomplice jury instruction is requested, the jury must be instructed that the uncorroborated testimony should be regarded with "great caution and suspicion." *Williams*, 32 So. 3d at 490-91 (¶15) (quoting *Walton v. State*, 998 So. 2d 971, 977 (¶17) (Miss. 2008)). Here, the trial court instructed the jury as follows:

> The Court instructs the jury that during the course of this trial, you heard testimony from witness Cordale McCarty who claimed to have participated with the defendant in the crimes of Capital Murder, Attempted Murder and Conspiracy to Commit Armed Robbery. Cordale McCarty is an admitted accomplice, and, as such, the jury should consider his testimony with great caution and suspicion. The jury is the sole judge of the credibility and the believability of all the witnesses, and it is for the jury to decide how much weight and worth, if any, to give the testimony of the witnesses, including McCarty. In considering his testimony, you may accept such portions, if any, that you deem credible, and reject such portions, if any, that you do not deem worthy of belief.

Thus, even if McCarty's testimony was uncorroborated, via the required jury instruction, the trial court properly advised the jury that McCarty was an admitted participant in the alleged crimes and that it was to consider McCarty's testimony with "great caution and suspicion."

¶18. Further, "[o]nly slight corroboration of an accomplice's testimony is required to sustain a conviction." *Osborne*, 54 So. 3d at 847 (¶22) (citing *Mangum v. State*, 762 So. 2d 337, 342 (¶12) (Miss. 2000)). The corroborating testimony must be the part connecting the defendant to the crime. *Id*. Here, record evidence corroborates aspects of McCarty's testimony.

8

¶19. Investigator Jeremey Arendale testified to recovering six spent .45-caliber shell casings at the crime scene. Investigator Steven O'Neal testified that upon his review of the shell casings collected from the crime scene, he found them to have a .45-caliber diameter and that they were made by Federal Manufacturing. Investigator O'Neal further testified that while either a revolver or an automatic firearm could shoot a .45-caliber bullet, a revolver would not eject bullets and leave behind casings on the ground. According to Chief Delando Wilson and Investigator O'Neal, police arrested Johnson coming out of a room in which they found .45-caliber ammunition made by Federal Manufacturing. That ammunition was consistent with the .45-caliber shell casings collected from the May 2, 2014 crime scene. Investigator O'Neal further testified that .45-caliber and .38-caliber bullets were recovered from Simmons's body. The forensic pathologist, Tommy Bishop, testified that .45-caliber bullets were recovered from Simmons's clothing, left shoulder, and neck.

¶20. Further testimony also connected Johnson to the crime. Mitchell testified that McKinney and another person shot her. Melvin identified Johnson as a person banned from the club for a fight that occurred before the shooting. Melvin further identified Johnson as having the same type of build as one of the two men he saw running from the crime scene on the evening Simmons and Mitchell were shot.

¶21. In *Gandy v. State*, 373 So. 2d 1042, 1045 (Miss. 1979), the supreme court stated Mississippi's view of the jury's role and function:

> Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the

9

utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.

¶22. As this Court has held, "the jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness." *Reeves v. State*, 825 So. 2d 77, 80 (¶8) (Miss. Ct. App. 2002). The jury, not this Court, is the ultimate finder of fact. *Id*. It is not for this Court to "go behind the jury to detect whether the testimony and evidence it chose to believe was or was not the most credible." *Id*. The jury chose to convict Johnson after hearing each witness's testimony. Furthermore, the jury heard McCarty acknowledge that he lied to police and was a co-defendant, yet the jury still chose to convict Johnson.

## CONCLUSION

¶23. We will not disturb the jury's verdict based on these facts and affirm Johnson's convictions and sentences.

¶24. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**