# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01348-COA

**MYLES FLINT JOHNSON**                                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                        **APPELLEE**

DATE OF JUDGMENT:              11/06/2024
TRIAL JUDGE:                   HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:     MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: INDIA MARIAH SPRINKLE
DISTRICT ATTORNEY:             JOHN K. BRAMLETT JR.
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 02/17/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     Law enforcement was dispatched to a house after receiving a call from a man stating that his wife had been shot. After arriving, the man told law enforcement that the couple had gotten into an argument, and the gun he had retrieved accidentally went off. The man was indicted for first-degree murder but found guilty of the lesser-included offense of second-degree murder.

¶2.     On appeal, he claims that evidence was improperly admitted, that he received ineffective assistance of counsel, and that the evidence was insufficient to support his conviction of the lesser-included offense. Finding no error, we affirm.

# FACTS

¶3. One Tuesday morning in January 2024, officers from the Canton Police Department were dispatched to a house after receiving a call from a man informing them that his "wife ha[d] been shot" and that she was not "doing too well." After arriving at the scene within moments of one another, Myles Johnson ushered Officers Edgar Esco, Cameron Plummer, and Jeremy Gooden inside and led them towards the back of the house.

¶4. As they entered through the front of the house, the officers observed that the living room was "in disarray," noting the plastic-covered floor and drops of blood scattered throughout the room. Officers moved from the living room towards the kitchen area, where they saw "Clorox cleaning supplies" and what appeared to be a "bloody sponge" lying in the sink. Across from the kitchen was Johnson's bedroom, where officers found his wife, Kristi Johnson, lying in bed with the covers bundled up to her neck. Upon entering the bedroom, "the unique smell of decomposition" filled the air, and the officers immediately noticed "there was blood everywhere," saturating "the floor[,] . . . the mattress[,] . . . the cover that was use[d] to wrap Mrs. Johnson up[,] . . . [and] the wall over by Mrs. Johnson."

¶5. After Officer Esco asked Johnson what happened, Johnson explained that he and his wife "were drinking" the night before and got "in[to] an argument." Claiming that Kristi "wanted to kill herself" and "grabbed a gun," Johnson directed the officers to a .22-caliber pistol located on the kitchen counter directly across from the bedroom. He told all three officers that he "tried to get [the gun] away from" his wife—that he "pushed her to get her away"—but then the firearm "went off."

2

¶6. Officer Plummer asked Johnson whether he called the police to report the incident when it happened, but Johnson confessed that he did not, explaining that he "freaked out because she killed herself." Then, Officer Plummer notified Johnson that he was detaining him and subsequently handcuffed him. Before removing Johnson from the home, Officer Plummer disclosed to Officers Esco and Gooden that he was unsure whether Kristi was deceased, as he had called out to her twice, both times receiving no response. But Johnson insisted that his wife was "opening her eyes" and still "breathing."

¶7. Once Johnson was removed from the home, Officers Esco and Gooden continued examining the crime scene while waiting for Emergency Medical Services to arrive. Next to a pair of blood-soaked men's jeans, Officer Gooden noticed a baseball bat "on the right side of the bed" in the corner of the couple's bedroom. On the left side of the couple's bed—where Kristi was lying—Officer Gooden "discovered a .45[-caliber] shell-casing" on the floor. And "located in a toolbox at the foot of the bed," the officer found a loaded .45-caliber handgun. When Emergency Medical Services arrived to move the victim, officers observed "what appear[ed] to be bruises on the back as well as the front of her body."

¶8. Soon after, Johnson was indicted on one count of first-degree murder.

## PROCEDURAL HISTORY

### Pretrial Motion

¶9. Prior to trial, the defense filed a motion in limine seeking to exclude evidence of prior bad acts. The motion focused on the exclusion of "Johnson's alleged prior felony convictions," as well as his "alleged prior incidents of domestic violence for which [he] was

3

never arrested, charged or tried." In response, the State disclosed that it did "not intend to use evidence of [Johnson's] prior convictions in its case-in-chief." However, because it did "intend to call witnesses . . . regarding prior instances of domestic violence between [Johnson] and the deceased victim Krist[i] Johnson pursuant to MRE 404(b)," the State requested that the defense's motion be denied on that ground.

¶10. The trial court addressed the defense's motion to exclude during a pretrial conference. The State proffered that Kristi's biological children would testify about the "firsthand domestic abuse" they witnessed at the hands of Johnson "towards the victim." The defense argued such testimony would not be offered "to show that [Johnson] had motive to kill his wife," but instead, was "pure character assassination," offered solely "to show that he ha[d] a history of domestic violence in the hopes that the jury will conclude that he acted in conformity with that character[.]"

¶11. Noting that Rule "404(b) does not require a conviction for the prior offense," the trial court denied the defense's motion "as it relates to the allegations of domestic abuse" and instructed that such evidence may "only be offered to show [Johnson's] motive, his intent, absence of mistake, accident and other matters." The court further instructed that Johnson would "be entitled to an instruction" explaining that the evidence "is not offered to prove that he is . . . guilty in this case[.]"

*Opening Statements*

¶12. During opening statements, the State submitted to the jury that by the close of trial they would find that Johnson "did deliberately and intentionally kill Kristi Johnson,"

4

furthering its theory of first-degree murder. Through counsel, Johnson countered the State's theory and put forth his own, conceding that Kristi "died by [his] hands" but claiming that "his level of culpability" was lesser than what the State suggested. During his opening statement, counsel for Johnson announced to the jury that the firearm "didn't go off magically." Instead, he explained that the evidence would show that Johnson was "being reckless with the gun, trigger-riding it, and it [went] off and it kill[ed] her."

*The State's Proof*

¶13. Multiple witnesses were called to testify on behalf of the State, including all three responding officers. Much of their testimony focused largely on their observations of the crime scene as well as their interactions with Johnson during that time. The body-cam footage of Officers Esco and Plummer was entered into evidence with no objection and played for the jury.

¶14. Dr. Bryan Platt, a staff pathologist for the Walter Reed National Military Medical Center, also testified for the State. Explaining his connection to Mississippi, Dr. Platt disclosed that he participates in "off-duty employment" and acts as a "traveling doctor" to "help[] complete the backlog of unwritten autopsy cases." However, he also helped perform "autopsies . . . at the office in Pearl," including Kristi Johnson's autopsy. He was accepted as an expert in the field of medicine with a specialty in forensic pathology by the trial court.

¶15. Dr. Platt testified that during the examination, his "initial first impression" of Kristi was that "she had multiple examples of decomposition present." Further explaining to the jury that "there w[ere] areas of skin discoloration" on "her chest and . . . back," the

pathologist testified that he noticed the skin "starting to slip and . . . de-glove." He also detailed that the victim sustained "multiple blunt force injuries and one gunshot wound." Dr. Platt's examination revealed that the lethal bullet entered through the victim's "mid-back," shattering one of her ribs, then puncturing her left lung, and heart before "exiting out [of] the neck."

¶16. The pathologist observed multiple "blunt force injuries consisting of abrasions and contusions" as well as "a blunt force injury to the back of her head," all of which were unrelated to the gunshot wound. He also disclosed that he noticed bruising on the victim's wrist, thighs, chest, and shoulder, also unrelated to the gunshot wound. When asked about the manner of the victim's death, the State elicited the following testimony:

> The State: You had the opportunity to say it was an accident. Do you want to change it to accident?
>
> Dr. Platt: There is no evidence to suggest that.
>
> The State: Do you have any evidence of a suicide?
>
> Dr. Platt: There's no evidence this was a suicide.
>
> The State: Shot in the back. Correct?
>
> Dr. Platt: (Indicating affirmative response.)

Based on his autopsy of the victim, Dr. Platt testified that he ultimately ruled the victim's manner of death was homicide.

¶17. Alyssa Jones, Johnson's daughter, testified next. After identifying Johnson in the courtroom, Jones testified that "[a]t one point in time," she and her father had a close relationship. She explained that in January 2024, the two spoke "off and on," and Jones

6

recounted receiving an odd text message from Johnson on the evening of Sunday, January 28:

> I know [now's] not the time but I made a big mistake and [I] don't know how I'm going to pay for [it.] I'm so sorry. I didn't mean it if I did it would have been planned. I love you just know and remember that please. I'll come to you if you want. But know I'm a dead man. [I'm] so sorry. I'm not going back to prison alive. Love you always and forever.

¶18. Days later—on the following Thursday—Jones testified that her mother told her "that Kristi was shot," causing her to reflect on the message she previously received from her father. Jones disclosed that based on her knowledge, she "called around to police stations . . . trying to find out where [Johnson] was located" so she could "let them know what [she] had." She then sent the text message she received from her father to law enforcement.

¶19. The jury also heard from two of Kristi's work supervisors. They both testified that she was a punctual employee who was hardworking and reliable. Her direct supervisor further detailed how Kristi was "real respected around work," which is why it caught his attention when she came to work one time with a black eye and nose. Kristi insisted that the bruising on her face was the result of accidentally hitting the steering wheel after a wasp flew into her car and she slammed on the brakes. Additionally, a second supervisor recalled a time at work when he "notice[d] bruising on [Kristi's] face and arm," which concerned him. He testified that he gave the victim a pamphlet detailing the "array of different services" offered by the company—like counseling—and disclosed it was "all confidential," should she ever choose to seek help.

¶20. Kristi's direct supervisor testified that he found it unusual that "she didn't show up

for work" on Monday, January 29, explaining "she [is] usually going to call." But the following morning, he received a text message "from a number on her behalf." It read:

> Hey buddy I'm calling for kj. [W]e are both sick as dogs migraine and getting sick to her stomach for a second day now. [S]orry and t[hank] y[ou].

Finding the message "curious," the direct supervisor informed the human resources department of the situation so that someone could "do a courtesy check on" Kristi. Before a check could take place, the department was informed of Kristi's death through her sister.

¶21. The victim's two children, Shelbi Pepper and Mikel Smith, testified as well. Pepper disclosed that Johnson and her mother began dating in 2013 and married in 2014. Although the two met in California, she testified that Johnson and her mother eventually moved to Kentucky. Pepper recounted receiving a disturbing FaceTime call from her mother a few years into her marriage with Johnson. Explaining that her mother "was in the hospital" during the call, Pepper further detailed that "[s]he had stitches across her forehead, no teeth, and bruises on her face." Alarmed, Pepper immediately bought her mother a plane ticket and flew her back to California, where she remained for four years. During that time, Pepper disclosed that she and her mother were "very close."

¶22. But that changed when Johnson called "saying that he had some of her [mother's] stuff." Kristi "said she was going to go on a vacation" and left for Mississippi to collect her items from Johnson. Pepper testified that after her mother left California, she "spoke to her maybe twice within a whole year time frame." And by the end of 2023 and the beginning of 2024, Pepper disclosed that she and her mother no longer spoke because her mother's phone had been disconnected.

8

¶23. Then, Kristi's son recounted his experience with his mother and Johnson to the jury. Smith explained that in 2013, he was living in California with his aunt when the two moved in with them for "[a]bout a year." Smith testified that sometime during that year, Johnson "grabbed [his mother] and picked her up by the neck" when she attempted to "stick[] up for" him. Once his mother and Johnson moved out, he "lost all contact with [his] mom" until she moved in with her daughter—his sister—three years later. But Smith testified that he "lost all contact again" with Kristi when she left California for Mississippi.

¶24. After the State rested its case-in-chief, the defense moved for a directed verdict "based on the State's failure to [prove] a prima facie case for first-degree murder." Specifically, the defense argued that the State failed to put forth any "evidence of deliberate design" or "evidence of a scheme or plan to murder the victim." Viewing all the evidence "in the light most favorable to the nonmoving party," the trial court found there was "a question of fact for the jury" and denied the defense's motion.

*The Defense's Case-in-Chief*

¶25. Then, Johnson took the stand in his own defense. He testified that although he and Kristi did not have any physical altercations during their first couple of years of marriage, they did have them in the years that followed. However, Johnson insisted that he never hit Kristi as if she were a man, clarifying that "if [they] got physical at all," those instances were "[m]ore like shouting match[es]" or "maybe a little pushing and shoving."

¶26. Johnson recounted the day of Kristi's death, detailing to the jury that after the two woke up, they "started drinking right away" and continued "all day long." Johnson disclosed

9

that eventually the couple got into an argument because Kristi "found out [he] was talking to some girls on the Internet." He claimed that during their argument, his wife "picked up a baseball bat" and "smash[ed] things around the room" while "screaming at [him]." Johnson explained that things progressed from screaming to Kristi "chasing [him] through the house" with the bat. At some point, he fell and realized he had "a piece of glass sticking out of [his] elbow," so he pulled it out, which left blood throughout the house as a result.

¶27. Once Kristi was no longer chasing Johnson, he told the jury that he found her in their bedroom, facing away from him and smoking a cigarette while still holding onto the baseball bat. Then, Johnson explained that he grabbed "the pistol out of the toolbox" he kept in their bedroom because he "wanted her to put the bat down" and "not . . . hit [him] no more with" it. After acknowledging that Kristi "finally put the bat down," defense counsel elicited the following testimony from Johnson:

> The defense: When she put the bat down, did you put the gun down?
>
> Johnson: No, I didn't.
>
> The defense: Why on earth not?
>
> Johnson: I don't know why. I have no idea. I was sitting there, like, talking with it in my hand. I just -- I have no idea. I just don't know why I didn't put it down. I should have. I wish I would have.

When asked what happened next, Johnson testified that he tried to "plead [his] case" to Kristi, begging for her to forgive him. But she continued crying while lying "down on her side" of the bed with her back turned to him. And then, Johnson told the jury that "the gun just [went] off," insisting that he "didn't cock the gun" but admitting that he "knew it was

10

loaded."

¶28. Johnson admitted he did not call 911 immediately because he "had all of these emotions . . . that just overwhelmed [him]," and he "started freaking out." Explaining how he was essentially "short-circuiting," Johnson told the jury that he "couldn't believe [he] had just shot [his] wife." Immediately afterward, he disclosed that he contemplated "commit[ing] suicide," but instead, "picked up the bottle" and "continued drinking," eventually "passing out" and then waking up unsure "how much time elapsed."

¶29. On cross-examination, Johnson acknowledged that his version of events had changed multiple times. He admitted that he lied to officers on the scene about the type of firearm that killed his wife, conceding that it was actually a .45-caliber gun rather than a .22-caliber gun. The State then elicited the following testimony:

> The State: You're saying you took the gun out of the toolbox. Correct?
>
> Johnson: Yes.
>
> The State: You walked up to the bed. Correct? You agree with me you walked up to the bed?
>
> Johnson: Yes.
>
> The State: Her back was turned towards you. Correct?
>
> Johnson: Uh-huh.
>
> . . . .
>
> The State: But you agree with me that the bullet went into her back. Correct?
>
> Johnson: Yeah, it was after she was [lying] down.

11

The State: Right, because she was in the bed. Right? Facing away from you. You agree with me. Right?

Johnson: Yes.

He further admitted that he waited at least two days after shooting his wife before he called the police.

*Jury Instructions and Verdict*

¶30. After resting its case-in-chief, the defense requested that a jury instruction for the lesser-included charge of culpable negligence manslaughter also be submitted to the jury. The trial court agreed and gave the instruction.

¶31. Ultimately, the jury found Johnson guilty of the lesser-included offense of second-degree murder. He was sentenced to serve forty years in the custody of the Mississippi Department of Corrections. Johnson moved for judgment notwithstanding the verdict or a new trial, which the trial court denied. Johnson appealed.

**DISCUSSION**

¶32. On appeal, Johnson raises three assignments of error, namely that the trial court improperly admitted evidence, that he received ineffective assistance of counsel, and that the evidence at trial was insufficient to support his conviction.

**I.    The supervisor's testimony was properly admitted.**

¶33. Johnson first argues that the trial court improperly admitted evidence in violation of Mississippi Rule of Evidence 404(b)(1). Specifically, Johnson asserts that "testimony from Kristi's coworkers that she had come to work with bruising on her face" was "in no way linked to [him]," and admitting such evidence was not only improper under Rule 404(b)(1),

12

but "overly prejudicial under Mississippi Rule of Evidence 403."

¶34.    "This Court reviews the trial court's decision to admit or exclude evidence under an abuse of discretion standard of review." *Terry v. State*, 412 So. 3d 1274, 1280 (¶26) (Miss. Ct. App. 2025) (quoting *Randall v. State*, 395 So. 3d 458, 462 (¶17) (Miss. Ct. App. 2024)). We "will not reverse a trial judge's decision on the admissibility of testimony offered at trial unless prejudice amounting to reversible error resulted from such a decision." *Id.* (quoting *Dukes v. State*, 369 So. 3d 553, 558 (¶13) (Miss. 2023)).

¶35.    Generally, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character . . . to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1).    However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  MRE 404(b)(2); *see also Bruce v. State*, 35 So. 3d 1236, 1239 (¶12) (Miss. Ct. App. 2010) (allowing "evidence of another crime . . . if it sheds light upon the motive").  Indeed, our Supreme Court has held "even though it may reveal other crimes, evidence or testimony may be given in order to tell a rational and coherent story of what happened and where it is substantially necessary to present a complete story." *Bruce*, 35 So. 3d at 1239 (¶12) (quoting *Flowers v. State*, 773 So. 2d 309, 319 (¶28) (Miss. 2000)).

¶36.    Moreover, "this Court has held that evidence of other violent incidents may be admissible to show the escalating level of violence[.]" *Wallace v. State*, 369 So. 3d 83, 90 (¶21) (Miss. Ct. App. 2023) (quotation mark omitted) (quoting *Marbra v. State*, 904 So. 2d

1169, 1175 (¶21) (Miss. Ct. App. 2004)); *see also Moss v. State*, 727 So. 2d 720, 725 (¶19) (Miss. Ct. App. 1998) (finding prior instances of domestic abuse admissible "to show the escalating level of violence, culminating in the crime of the murder"). "In such cases, testimony regarding prior acts of violence is admissible "not to prove the character of" the defendant but rather to show "a continuing pattern of violence against the victim that resulted in her death." *Wallace*, 369 So. 3d at 90 (¶21) (quoting *Moss*, 727 So. 2d at 725 (¶19)). "Such evidence is relevant and admissible under Rule 404(b) to show the defendant's motive and intent." *Id.* (quotation mark omitted).

¶37. "Regardless of its origin, before a trial court admits other-acts evidence, it must be filtered through Mississippi Rule of Evidence 403." *Terry*, 412 So. 3d at 1280 (¶29) (quoting *Bowman v. State*, 283 So. 3d 154, 165 (¶39) (Miss. 2019)). "Under Rule 403, when weighing admission of relevant evidence, a trial judge *may* exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 1280-81 (¶29). "The weighing and balancing task required by Rule 403 asks only that a judge rely on his/her own sound judgment." *Id.* (quoting *Masters v. State*, 285 So. 3d 192, 197 (¶16) (Miss. Ct. App. 2019)).

¶38. At trial, Johnson claimed that although he grabbed the firearm while his wife's back was turned to him, he was unsure how it "went off." Acknowledging that shooting his wife was a "big mistake," Johnson asserted that the result was nothing more than a tragic accident—one he did not intend. Countering his argument, the State called the victim's children, who both testified to prior instances where Johnson physically abused their mother.

14

Smith testified that he watched Johnson grab his mother and "pick[] her up by the neck." Pepper testified that after receiving an alarming FaceTime call from her bruised and toothless mother, she bought her a plane ticket so she could leave Johnson. Testimony from the victim's supervisors regarding bruising they noticed on her face while at work further supported not only her children's testimony, but also the State's assertion that Johnson had a history of domestic violence towards Kristi.

¶39. Additionally, although Johnson claims that the admission of the supervisor's testimony was "overly prejudicial under Mississippi Rule of Evidence 403," Johnson admitted that he and Kristi had "physical altercations" during their marriage. Indeed, the jury heard Johnson testify that he never hit his wife as if she were a man, but there were "shouting match[es]" and "a little pushing and shoving and whatever." The jury also heard Johnson admit that after taking his pistol out of the toolbox, he walked up to the bed and pointed the gun at his unarmed wife while she was facing away from him. Johnson's testimony alone serves to corroborate the State's contention that his wife's death was intentional.

¶40. While we note that the State likely did not need testimony from the victim's supervisors to prove Johnson's motive, intent, absence of mistake, or lack of accident given Johnson's own testimony, as well as the testimony of Kristi's children, we cannot say that the trial court abused its discretion in admitting such evidence.

¶41. The trial court exercised its sound judgment and found the testimony of the victim's supervisors admissible "to show [Johnson]'s motive, his intent, absence of mistake, [lack of] accident," all of which are permissive uses under Rule 404(b)(2). Therefore, we find no

15

abuse of discretion in the admission.

## II. The record is insufficient to address Johnson's ineffective assistance claim on direct appeal.

¶42. Next, Johnson contends that he received ineffective assistance of counsel. Acknowledging that he "received the benefit of a second-degree murder and culpable negligence manslaughter instruction," Johnson contemporaneously claims that his trial counsel provided "constitutionally ineffective" representation to his "material detriment." Specifically, he insists that his trial counsel's "fail[ure] to seek a jury instruction on accidental homicide" despite "evidence that [he] claimed Kristi's homicide was accidental" constituted ineffective assistance.

¶43. "At the outset, we note that this Court typically preserves ineffective-assistance-of-counsel claims for post-conviction review." *Latham v. State*, 299 So. 3d 768, 773 (¶16) (Miss. 2020). "This is because we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim." *Ellzey v. State*, 412 So. 3d 358, 381 (¶52) (Miss. Ct. App. 2024) (quoting *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002)).

¶44. Nonetheless, "[t]his Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.* (brackets omitted) (quoting *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020)). "This Court has also resolved ineffective-assistance-of-counsel claims on direct appeal when the record

16

affirmatively shows that the claims are without merit." *Id.* "If the record on direct appeal is insufficient to address the defendant's ineffective assistance claims, we will 'dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief.'" *Id.* (quoting *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013)). Claims of ineffective assistance of counsel are reviewed de novo. *Latham*, 299 So. 3d at 772 (¶12).

¶45. Here, the State does not stipulate that the record is adequate for this Court to review Johnson's ineffective assistance claim. Nor does the record "affirmatively show[] ineffectiveness of constitutional dimensions." *Ellzey*, 412 So. 3d at 381 (¶52). After our review of the record, we conclude that the record is insufficient to address Johnson's ineffective assistance claim on direct appeal. Therefore, his claim is "dismissed without prejudice for [him] to raise later in a properly filed motion for post-conviction relief." *Sandlin*, 156 So. 3d at 821 (¶35).

### III. The State presented sufficient evidence to convict Johnson of second-degree murder.

¶46. Finally, Johnson attacks the sufficiency of the evidence arguing that "the State failed to prove [his] guilt beyond a reasonable doubt." Specifically, he contends that although "there is evidence that Kristi was shot, no evidence exists as to [his] intent (or lack thereof) when the shooting occurred," particularly that "it was done with a depraved heart."

¶47. "Challenges to the sufficiency of the evidence warrant a de novo standard of review." *Jordan v. State*, 413 So. 3d 611, 615 (¶21) (Miss. Ct. App. 2025) (citing *Haymon v. State*, 346 So. 3d 875, 881 (¶14) (Miss. 2022)). "When reviewing the sufficiency of the evidence,

'[w]e view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime.'" *Id.* (quoting *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010)).

¶48. Mississippi law defines second-degree murder as "[t]he killing of a human being without the authority of law . . . done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2020). Crucially, "under the second-degree murder statute, a finding of intent to kill is not required." *Jordan*, 413 So. 3d at 616 (¶22) (citing *McCool v. State*, 328 So. 3d 173, 183 (¶39) (Miss. Ct. App. 2021)).

¶49. Johnson admitted at trial that he shot his wife while she was crying in their bed, facing away from him, and no longer holding the bat—the entire reason he claimed to have grabbed his firearm in the first place. Indeed, the medical examiner testified that the victim was shot in the "mid-back" and that he found no evidence to suggest that the victim's death was an accident or a suicide. Based on this testimony alone, a rational juror could find that Johnson committed "an act eminently dangerous to others and evincing a depraved heart, regardless of human life," which ultimately resulted in Kristi's death. Miss. Code Ann. § 97-3-19(1)(b).

¶50. Additionally, we note that any uncertainty regarding the level of credibility of a witness or piece of evidence presented rests with the jury, and the jury alone. Indeed, it is well established that jurors "may believe or disbelieve, accept or reject the utterances of any witness." *Owens v. State*, 383 So. 3d 305, 310-11 (¶26) (Miss. 2024) (quoting *Gandy v.*

*State*, 373 So. 2d 1042, 1045 (Miss. 1979)); *see also Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017) (holding decisions regarding weight of evidence, witness credibility, and conflicts between evidence "belong solely to the jury"). It was the province of the jury to accept or reject Johnson's testimony, in whole or in part.

¶51. Accordingly, we find the evidence was sufficient to prove each essential element of second-degree murder beyond a reasonable doubt.

## CONCLUSION

¶52. For the reasons above, we find no abuse of discretion in the court's admission of the testimony from the victim's supervisors, as it was offered for a non-character purpose and was not overly prejudicial under Rule 403. Additionally, because we find the record insufficient to evaluate Johnson's ineffective assistance claim on direct appeal, we dismiss his claim without prejudice, allowing him to raise the claim later in a properly filed motion for post-conviction collateral relief. We also find there was sufficient evidence to support Johnson's conviction for second-degree murder. Therefore, Johnson's conviction and sentence are affirmed.

¶53. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**